14 P.3d 997

**STATE** of Arizona, Appellee,

v.

Aaron Scott **HOSKINS**, Appellant.

No. CR–97–0349–AP.

Supreme Court of Arizona,
En Banc.

Dec. 29, 2000.

Janet Napolitano, Attorney General, by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Colleen L. French, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Tucker Strohm Miller & Tucker, by Richard L. Strohm, Phoenix, Attorneys for Appellant.

## OPINION

JONES, Vice Chief Justice.

¶1 The defendant, Aaron Scott Hoskins, was convicted of premeditated murder, kidnapping, armed robbery and theft and was sentenced to death for the murder conviction and to various prison terms for the other crimes. This is a mandatory appeal of the death sentence pursuant to Rules 26.15 and 31.2 of the Arizona Rules of Criminal Procedure. The court has jurisdiction under article VI, section 5(3), of the Arizona Constitution and A.R.S. § 13–4031 (1989). We affirm the convictions and sentences.

## FACTS

¶2 At 7:30 p.m., July 31, 1994, Crystel Cabral, age 18, left her home with an eight-year-old cousin in a borrowed red Suzuki Samurai. After taking the cousin to dinner, Cabral took him to his home. Later, at about 10:00 p.m., she visited her friend, Aaron Hyde, at his home in Mesa. The two went for a drive in the Suzuki, purchased soft drinks, then returned to Hyde's home where they engaged in conversation outside the house. When Cabral drove away, Hyde entered the house and looked at a clock because he intended to make a phone call and was concerned that it might be too late. He noted that the time was 11:30 p.m. Hyde was the last of Cabral's friends or family to see her alive.

¶3 The next day, an Arizona Department of Transportation employee found Cabral's driver's license and other of her pictures and papers strewn along the Superstition Freeway section of Highway 60. The employee picked up the license, but left the other items. On August 3, 1994, the employee learned from media reports that Cabral was missing, and he called the Department of Public Safety. Based on this information, Department of Public Safety officers returned to the location and gathered pictures and papers belonging to Cabral. The same day, the police conducted a helicopter search of the desert northeast of Mesa and found Cabral's body with gunshot wounds to her left chest and forehead. Fingerprints belonging to defendant's brother-in-law, codefendant Scott DeShaw, were later discovered on some of the items recovered along Highway 60. These items had been removed from Cabral's billfold.

¶4 On July 31, 1994, the night of Cabral's disappearance, defendant and DeShaw left their home in Gilbert on foot between 10:00 p.m. and 11:00 p.m. By his admission to police, defendant and DeShaw were in the general vicinity where Hyde had last seen Cabral at the approximate time she left his house.

¶5 At 5:30 a.m. the next day, Ken Wood was awakened by the Cabral Suzuki Samurai being driven on and off the road near his campsite in the area of Pinetop/Lakeside, Arizona, approximately 150 miles northeast of the Mesa location where Cabral had been seen the previous night. Wood saw two people in the vehicle and noticed that the passenger had an "unusual haircut ... long hair and cut off and a line with real short hair below on the sides."

¶6 Nearby, at approximately 7:00 a.m., Cheryl and Gerald Walker, on their way to Mrs. Walker's work, happened upon the red Suzuki Samurai which had just overturned on a remote country road near Pinetop. The couple witnessed the defendant and DeShaw crawl out of the overturned vehicle. Mr. Walker helped in an unsuccessful attempt to right the vehicle. The Walkers then offered assistance, including a ride into town and use of a cellular phone. Defendant refused, stating that his mother lived nearby. The Walkers then observed the defendant reenter the overturned vehicle after remarking that he needed to find his lighter. Moments later, he reemerged holding a rolled up pink towel. After spending fifteen to twenty minutes with the defendant and DeShaw, the Walkers drove on their way, observing the two begin to walk up a mountain in a direction away from the town.

¶7 At about 6:00 p.m., the Walkers again drove past the accident scene and, seeing several police officers, stopped to disclose their encounter with the defendant and DeShaw that morning. The Walkers gave the officers a detailed description of the two men. They described the younger of the two, DeShaw, as having hair that was long on top and shaved on the sides and wearing a denim jacket with "Ozzie" or "Ozzie Osborne" written on it. The Walkers stated that the older of the two, the defendant, had long hair, a goatee-style scraggly beard, and eight earrings in his right ear. After giving the police this information, the Walkers left.

¶8 By this time, the officers knew the overturned Suzuki was the subject of a Department of Public Safety search involving a missing woman, Crystel Cabral. The police were also informed that the vehicle was registered to Cabral's friend, Karen Muir. A local resident, "Winkie" Wipple, approached the officers at the accident scene and, upon inquiry, told them he had just seen two men walking along a nearby road. The officers immediately set out to locate the two.

¶9 Two police officers drove separate vehicles toward the location that Wipple had indicated and saw two men matching the descriptions given by the Walkers. The officers maneuvered their cars on either side of the men and notified them that they matched the description of two men seen at the scene of an accident earlier in the day. Officer Ebert began a pat-down search of the defendant, who advised the officer that he "had a gun in his waistband." The officer removed the revolver and noted that the cylinder contained two rounds and four empty chambers. Overhearing the defendant's reference to the gun, Officer Thomason turned toward DeShaw, who turned away with his hands in front of him. The officer grabbed DeShaw by both arms and pulled back, at which point a large two-bladed knife dropped to the ground. During his search of DeShaw, the officer recovered a lighter and the victim's key chain. The two were placed under arrest. During the discussion and search, the defendant told the officers that he "rode up here ... with a friend by the name of Paul in a blue Trans Am." Police also later discovered a pink towel and white sweat pants, presumably the items the Walkers witnessed defendant remove from the overturned Suzuki, discarded along the route between the accident and where defendant and DeShaw were arrested.

¶10 Other officers then arrived at the scene and the Walkers were contacted and asked to return for a show-up identification. While they were waiting, one of the officers, Huser, recognized the defendant as a former local resident and began a conversation with him. During this discussion, the defendant told Huser that "he got a ride up from a friend in a brown Camaro because he and his mother had an argument and that he would try to make it better."

¶11 A few minutes later, Deputy Webster, with the Walkers in the back of his vehicle, drove to within ten feet of the defendant and DeShaw, who stood handcuffed and flanked by uniformed police officers. The suspects were the only two people in civilian clothing at the scene. As police shone a bright light on the suspects, Mr. Walker immediately identified them as the two the Walkers had encountered that morning. Mrs. Walker also positively identified both the defendant and DeShaw as they passed by them a second time. Deputy Webster showed the couple a denim jacket retrieved from the defendant.

Mr. Walker identified the jacket as the one worn by DeShaw, and Mrs. Walker agreed after seeing the writing on the jacket.

¶ 12 Defendant and DeShaw were transported to the Navajo County Sheriff's Office substation in Pinetop at approximately 7:50 p.m. Because the station did not have a jail cell, the defendant was handcuffed to a desk in the Deputies' Room. At 11:41 p.m., he was taken to an interview room with Mesa Detective Gates and Navajo County Sheriff's Detective Zaremba. The two detectives identified themselves, explained the circumstances surrounding the victim's disappearance, and determined that the defendant was alert and uninjured. They then turned on a tape recorder and gave defendant the *Miranda*[1] warning. Defendant immediately told the detectives that he had no knowledge of a missing girl and that he had arrived earlier that day in a blue Trans Am. He then requested an attorney, and the detectives turned off the tape recorder. The detectives, however, continued to talk to the defendant, explaining the purpose of their investigation and indicating it might involve a homicide. Detective Gates then gave defendant his phone number written on Detective Zaremba's business card. At this moment, defendant commented that he "shouldn't have believed Paul telling him about buying that gun for $50.00 this morning." Once again, he requested counsel.

¶ 13 Following the interview, at about 12:20 a.m. on August 2, 1994, Detective Zaremba performed a gun powder residue test on defendant's hands. As the detective conducted the test, the defendant asked how long after firing a gun, residue would be detectable, and he stated he had fired the gun in the forest. A transcript of the defendant's subsequent comments indicates that he was responding to officer-initiated conversation. Following the powder residue test, one of the detectives escorted the defendant to the restroom, where he volunteered the statement, "I did something really stupid. I shouldn't have had that gun, and I guess I'll pay the price."

¶ 14 Defendant was taken for an initial appearance in Justice Court the morning of August 2, 1994. While being escorted back to the station, defendant told Deputy Webster that his arm and shoulder hurt because he banged them on the roll bar when the Suzuki rolled. At about 8:00 p.m., defendant again complained of shoulder and head pain. As Officer Huser prepared to transport the defendant to the hospital, the defendant asked whether his attorney's phone number was on a "post-it" attached to Detective Zaremba's business card. He said he did not care about the number but he wanted the card. Huser then suggested the defendant should speak with the officers and drove him to the hospital. En route, the defendant asked to speak with Detective Zaremba, but agreed to talk to Detective Gates when told that Zaremba was unavailable. Huser told the defendant that he could speak with Gates after his visit to the hospital. While at the hospital, the defendant said that he sustained his injuries during the rollover and that DeShaw had been driving the vehicle.

¶ 15 After approximately two-and-a-half hours at the hospital, physicians informed police that the defendant did not require hospitalization. He was returned to the police station where Detective Gates read him his *Miranda* rights a second time and interviewed him for three and a half hours. At no point did the defendant give any indication that he wished not to speak with the detectives.

¶ 16 Subsequent to defendant's and DeShaw's arrests, a police investigation was simultaneously undertaken in Mesa where officers learned from defendant's friend and former roommate, Mark Nelson, that defendant had told Nelson several weeks earlier that he planned to car-jack an automobile and kill someone in the course of the car-jacking. Specifically, the defendant told Nelson that he "wanted to go out and get somebody and take their car and kill them. . . ." Nelson also quoted the defendant as saying he would shoot his victim "in the head."

¶ 17 Mesa Police also discovered that another of defendant's acquaintances, David Masterson, overheard defendant on several occasions express a desire to commit a car-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

jacking and to go to Pinetop. Police discovered that another of defendant's neighbors, Masterson's step-father Clifford Barry, had discovered that his .38 Smith & Wesson revolver was missing after a camping trip which DeShaw had attended. Barry identified the revolver recovered from defendant's person as his missing revolver. Police ballistics positively identified the revolver as the weapon that fired the two rounds which killed Cabral.

## PROCEDURAL HISTORY

¶ 18 On August 19, 1994, a Maricopa County Grand Jury indicted defendant for the following crimes: Count One, first degree premeditated murder and felony murder; Count Two, kidnapping; Count Three, armed robbery; Count Four, theft.[2] The state filed a timely Notice of Intent to Seek the Death Penalty on September 2, 1994. Various suppression motions were consolidated and heard by the trial court. All motions were denied on May 6, 1996. The trial began October 29, 1996.

¶ 19 On November 12, 1996, the twelve-member jury found the defendant guilty on all charges except felony murder. On July 11, 1997, the trial court held an aggravation-mitigation hearing pursuant to A.R.S. § 13–703(B) (Supp.1999).[3]

¶ 20 In its special verdict, the court found the state proved beyond a reasonable doubt the single aggravating factor that the defendant committed the murder of Crystel Cabral in expectation of pecuniary gain, pursuant to A.R.S. § 13–703(F)(5). The court found that defendant's age (20 years, 3 months) was a statutory mitigator, pursuant to A.R.S. § 13–703(G)(5), and rejected other statutory mitigators consisting of mental impairment, duress, "minor" participant, and foreseeability of death. The trial court considered, as nonstatutory mitigators, the defendant's dysfunctional childhood, his antisocial or borderline personality disorder, his

demonstrated good behavior while in custody, and his emotional immaturity and impulsivity. The court concluded the evidence was "not sufficiently substantial to outweigh the aggravating circumstance proved by the state ... to call for leniency." Accordingly, on July 18, 1997, the trial court sentenced defendant to death for the premeditated murder conviction.

## ISSUES

### TRIAL ISSUES

#### I. Post–Arrest Statements to Police as Violative of *Miranda*

¶ 21 Defendant contends the trial court erred in denying his motion to suppress various statements to police because the statements were elicited without benefit of warning as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

¶ 22 The challenged statements consist of defendant's roadside comment to Officer Ebert regarding his arrival in Pinetop in "a blue Trans Am," his reference to the gun in his waistband just prior to arrest, his statements while in custody in the interview room, and his inquiry at the Navajo County Sheriff's substation concerning the length of time gun powder residue remains detectable after firing a gun.

¶ 23 The state points out that although these statements were ruled admissible after the suppression hearing, defendant's claim that the alleged *Miranda* violations warrant reversal of his convictions is rendered moot because the statements were never offered at trial.

¶ 24 The state is correct. Even assuming a *Miranda* violation, non-reference to the statements at trial renders defendant's *Miranda* objections moot. *See State v. Starr,* 119 Ariz. 472, 476, 581 P.2d 706, 710 (App.1978) (defendant is not prejudiced

---

**2.** Co-defendant Scott Lee DeShaw was indicted for the same crimes in a separate case. The cases were consolidated and later severed before trial. After severance, each case was tried separately, and each defendant was represented by separate counsel.

**3.** The trial court sentenced defendant as follows: Count One, first degree murder—death; Count Two, kidnapping—21 years (consecutive to Count One); Count Three, armed robbery—21 years (consecutive to Count Two); Count Four, theft–7 years (concurrent with Count Three).

where the state makes no reference at trial to statements improperly obtained in violation of *Miranda*).

## II. Post–Arrest Statements to Police as Involuntary

■ ¶ 25 Defendant contends that all statements given by him to police should have been suppressed as involuntary. He reasons that in the absence of suppression, the presentation of evidence in his own defense was unduly impaired because he could not testify without risking impeachment. We have previously rejected this argument. "[S]tatements obtained in violation of ... *Miranda* ... may nevertheless be used for impeachment of the testimony given by the defendant ... provided the statements were obtained without violation of the traditional standards for evaluating voluntariness and trustworthiness." *State v. Walker*, 138 Ariz. 491, 495, 675 P.2d 1310, 1314 (1984) (citing *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975)).

¶ 26 Specifically, defendant argues that police delayed the *Miranda* warning, ignored his request for counsel, and withheld medical attention until after interrogation. The state responds that the defendant's statements were voluntary, but that even if they were not, defendant waived his right to challenge the trial court's voluntariness ruling when he chose not to testify at trial. *See State v. Gonzales*, 181 Ariz. 502, 512, 892 P.2d 838, 848 (1995).

■ ¶ 27 This court has held that when a defendant chooses not to testify, he waives the right to claim erroneous admission of involuntary statements for purposes of impeachment. See *id.; State v. Conner*, 163 Ariz. 97, 102–03, 786 P.2d 948, 953–54 (1990). Without the defendant's testimony, we are unable to ascertain whether error is prejudicial because the state chose not to offer the challenged statements. *See Gonzales*, 181 Ariz. at 512, 892 P.2d at 848. By testifying, the defendant assures review of actual rather than hypothetical prejudice. *See id.* Such a requirement also precludes a defendant from manufacturing a specious ground for appeal by falsely alleging that the impeachment threat alone deterred him from testifying.

*See id.* Therefore, because defendant in the present case did not testify, he waives his right to challenge the trial court's ruling on voluntariness.

■ ¶ 28 Although our conclusion on this issue rests on waiver, we concur in the trial court's ruling that the statements were in fact voluntary. In assessing voluntariness, we consider the totality of circumstances to determine whether the statements were or were not the product of a "rational intellect and a free will." *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal quotations omitted). Defendant contends that the circumstances of his arrest on an isolated country road, the place and conduct of interrogation, the absence of food or water, alleged deceit by police as to the true nature of the investigation, defendant's age, immaturity, the lack of family support, the circumstance of the crime, and alleged excessive media coverage render his statements to police involuntary.

¶ 29 We disagree. The record reveals no coercive or pretextual police tactics, no intellectual or physical infirmity, no deceitful practice, and no attempt to undermine defendant's "rational intellect or free will." *Gonzales*, 181 Ariz. at 512, 892 P.2d at 848. We conclude on this record that defendant's will was not overborne. His statements were neither coerced nor improperly induced, but were freely given in every respect.

## III. Propriety of Arrest

■ ¶ 30 We also reject defendant's assertion that his warrantless arrest was illegal pursuant to *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). That case is distinguishable on its facts. Brown was arrested without probable cause or warrant under circumstances indicating the arrest was investigatory. Here, defendant cannot credibly claim that an arrest on charges of leaving the scene of an injury accident, possession of stolen property, and carrying a concealed weapon was investigatory and without probable cause. A police officer has probable cause when reasonably trustworthy information and circumstance would lead a person of reasonable caution to believe that a

suspect has committed an offense. *See State v. Spears,* 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996). The defendant's arrest was proper.

## IV. On–the–Scene "Show–Up" Identification

¶ 31 Defendant, citing *State v. Williams,* 144 Ariz. 433, 698 P.2d 678 (1985), argues that "show-up" identification procedures are inherently suggestive and that their only justification is to ensure that suspects are detained no longer than necessary before determining whether there is sufficient basis for arrest. Defendant notes that courts employ five factors to evaluate the reliability of "show-up" procedures. *See Neil v. Biggers,* 409 U.S. 188, 199–201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Applying those factors, defendant asserts that his identification by Mr. and Mrs. Walker was unreliable because they (1) had a short opportunity to view the suspects during their interaction; (2) were not attentive to the scene; (3) provided "generic" rather than specific descriptions of the suspects; (4) were uncertain whether they could identify the suspects if they encountered them again; and, (5) were rushed by police to make a positive identification. *See id.* Defendant further argues that aside from the unreliability inherent in "show-ups," the "show-up" in the present case was unjustified because when Officer Ebert learned of the pistol in defendant's waistband, the decision had already been made to arrest him.

¶ 32 Defendant says police could have conducted a live line-up that would have avoided the inherent prejudice which attends the one-on-one identification procedure. Defendant argues, in any event, the state cannot prove by clear and convincing evidence that the pretrial identification was not unduly suggestive. *See State v. Dessureault,* 104 Ariz. 380, 384, 453 P.2d 951, 955 (1969).

¶ 33 In response, the state asserts that while a defendant has a due process right to a fair identification procedure, *State v. McCall,* 139 Ariz. 147, 154, 677 P.2d 920, 927 (1983), he has no constitutional right to a physical line-up. *See State v. White,* 160 Ariz. 24, 30, 770 P.2d 328, 334 (1989). "[O]ne

man showups" are permissible under *State v. Armijo,* 26 Ariz.App. 521, 523, 549 P.2d 616, 618 (1976).

¶ 34 The Walkers initially interacted with defendant for approximately twenty minutes. *Cf. State v. Fierro,* 166 Ariz. 539, 546, 804 P.2d 72, 79 (1990) (witness encounter of six minutes with defendant was adequate to establish reliability of witness' identification of defendant). The Walkers paid close attention to the defendant because they arrived in the aftermath of an automobile accident and rendered assistance to the defendant. *See State v. Smith,* 146 Ariz. 491, 497, 707 P.2d 289, 295 (1985) (a lack of diversion at the crime scene bolsters reliability of witness identification). The Walkers' description of the suspects was detailed and accurate, including the number of earrings defendant was wearing, DeShaw's "unusual" haircut, and the unique jacket worn by one of the suspects. While the "show-up" occurred almost twelve hours after the first encounter with defendant and DeShaw, the Walkers were unequivocal in identifying the two, and the record contradicts any notion that the twelve-hour period rendered the identification unreliable. *Cf., e.g., State v. Dixon,* 153 Ariz. 151, 155, 735 P.2d 761, 765 (1987) (witness identification reliable after a "few hours"); *State v. Strickland,* 113 Ariz. 445, 448, 556 P.2d 320, 323 (1976) (ten days between witness and subsequent identification of defendant does not necessarily render identification unreliable). The trial court did not abuse its discretion in ruling that the Walkers' show-up identification of defendant was fully reliable. *Cf. Armijo,* 26 Ariz.App. at 524, 549 P.2d at 619.

¶ 35 We conclude the show-up was justified and indeed was not suggestive under *Biggers.* Police need not take time for a line-up when searching for a missing person, who may be a kidnapping or homicide victim. At the time of the show-up, Cabral had not been located. While a line-up may be preferable, defendant's due process rights were not violated because the show-up identification procedure in this case was reliable. *See Manson v. Brathwaite,* 432 U.S. 98, 114–17, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *State v.*

*Chapple,* 135 Ariz. 281, 286, 660 P.2d 1208, 1213 (1983).

## V. Denial of Defense Challenges to Potential Jurors for Cause

¶ 36 Defendant contends the trial court erred by refusing to strike nine prospective jurors for cause. Defendant used peremptory challenges to remove seven of the nine. *Cf. State v. Huerta,* 175 Ariz. 262, 264, 855 P.2d 776, 778 (1993). Defendant further asserts that boilerplate voir dire questions about fairness are inadequate in a death penalty case. *See State v. Williams,* 113 N.J. 393, 550 A.2d 1172 (1988).

¶ 37 Arizona law provides that cause to excuse a prospective juror exists "[w]hen there is reasonable ground to believe that a juror cannot render a fair and impartial verdict...." Ariz.R.Crim.P. 18.4(b). The party challenging the juror bears the burden of establishing that the juror could not be fair and impartial. *State v. Trostle,* 191 Ariz. 4, 13, 951 P.2d 869, 878 (1997). In assessing a potential juror's fairness and impartiality, the trial court has the best opportunity to observe prospective jurors and thereby judge the credibility of each. *See State v. Pawley,* 123 Ariz. 387, 389, 599 P.2d 840, 842 (App. 1979). Importantly, a juror's assurances of impartiality need not be couched in absolute terms, *Trostle,* 191 Ariz. at 13, 951 P.2d at 878, and we will not set aside a trial court's ruling absent a clear showing of abuse of discretion. *See State v. Lavers,* 168 Ariz. 376, 390, 814 P.2d 333, 347 (1991); *see also Trostle,* 191 Ariz. at 12, 951 P.2d at 877.

¶ 38 In this case, defendant challenged nine prospective jurors. The judge conducted voir dire of each and concluded that he or she could be fair and impartial. Defendant first challenged Juror # 2, Collum, because she had a daughter and initially expressed a willingness to risk incarcerating an innocent defendant in order to ensure conviction of all guilty defendants, although she later stated that she believed conviction of innocent defendants was a risk inherent in the justice system because it is never possible to be absolutely certain from evidence and testimony that a person is guilty or innocent. Notwithstanding her expressed viewpoint, Collum responded to the court's voir dire as follows:

Court: All right. Ms. Collum, in reference to your general view that it is better that society let-or it's better to have a few innocent people go to jail rather than run the risk of letting a guilty person go free, does that general view affect at all this case and the understanding that this case has to be proven to you beyond a reasonable doubt? Does that affect that at all?

Ms. Collum: I do not feel that it would affect it.

¶ 39 Defendant challenged Juror # 7, Koebensky, because he said initially he had no tolerance for a person who would kill an innocent young girl, a sentiment he clarified as his belief that men should not abuse women. The trial court questioned Koebensky regarding his sentiment:

Court: Do you think that you can be a fair and impartial juror based upon everything now that you know about this case?

Mr. Koebensky: Yes.

¶ 40 Defendant challenged Juror # 42, Waiter, because she stated she had once been the victim of armed robbery and expressed a religious conviction in support of capital punishment. During voir dire, the following exchange occurred:

Court: What Mr. Storrs' concern is, and all of us are wondering, do you think that you would find yourself, so to speak, in the shoes of the victim, remembering your experiences of the gun being pointed at you and how angry you were, and do you think that you would lose your ability upon hearing facts about a gun being pointed and being shot perhaps, do you think that you would lose your ability to be fair and impartial because of your experience? I think that's the area we are trying to address.

Ms. Waiter: I would say right now, no, it would not affect me.

¶ 41 The trial court also questioned Ms. Waiter regarding her religious conviction in support of capital punishment:

Court: In that function as a juror, you cannot allow any thoughts that you have

about punishment affect your decision-making process in determining guilt or innocence. Do you understand that?

Ms. Waiter: Yes. I do.

Court: Do you believe that you can do that and put aside your philosophical views about the death penalty and not allow that to affect how you look at Mr. Hoskins' case?

Ms. Waiter: Yes.

¶ 42 Defendant challenged Juror # 60, Thielemann, because he expressed sympathy for the victim. The following voir dire exchange occurred:

Court: All right. As you are going along in the trial, if there is some feeling of sympathy for the victim that you find that you are having, is it your best thought that you would be able to put that aside and not allow that to affect your deliberations?

Mr. Thielemann: I believe so.

¶ 43 Defendant challenged Juror # 61, Lavery, because she stated initially she was uncertain whether she could be impartial. During voir dire, the following exchange took place between counsel and Ms. Lavery:

Mr. Storrs: So then, you would at this point be able to change your answer to Question 87 when it asked, "What is it about yourself that makes you feel you can be an impartial juror?" And you said, "I can try." Is that still the way you feel? Is there still a question in your mind after our discussion now?

Ms. Lavery: I would have to look at both sides. That's all I can say. I don't have going one way or the other. I am not picking either side.

Mr. Storrs: And I don't mean to belabor the point, you know, but I need to have your assurance that you will be able to do that and not just try. Do you understand what I mean?

Ms. Lavery: Yeah, I would be able to.

¶ 44 Defendant challenged Juror # 64, Coffin, because she exhibited an initial, fundamental misapprehension of the burden of proof in criminal cases by suggesting the defendant should have to prove his innocence. Despite her initial impression regarding the burden of proof, Ms. Coffin responded to the judge's subsequent questioning as follows:

Court: Ms. Coffin, let me follow up on that one issue. Ms. Sanders is correct. To be an appropriate juror, you have to come in with a neutral frame of mind. It is the state's burden of proving Mr. Hoskins guilty beyond a reasonable doubt. He is presumed to be innocent at this stage. That doesn't change unless Ms. Sanders proves that he is guilty beyond a reasonable doubt. The law is that Mr. Hoskins doesn't have to prove anything at all. He doesn't have to present any evidence. He doesn't have to testify. These are all important constitutional rights. Do you understand these rights?

Ms. Coffin: Yes, I do.

Court: All right. And even though you, in general, perhaps before you came in today, thought that the defendant should be required to prove his innocence, do you now understand that's not correct?

Ms. Coffin: Yes, I do.

Court: And do you now agree that you would be able to follow the Court's instructions on the law that the defendant doesn't have to prove anything to anybody?

Ms. Coffin: Yes, sir.

¶ 45 Defendant challenged Juror # 70, Thomas, because she first stated she did not understand why defendant did not have to testify in his own behalf. During voir dire, the following exchange took place:

Court: All right. Ms. Thomas, I am a little confused about what some of your thoughts are. The state will go ahead and present its evidence here in the case, and then Mr. Storrs and the defendant will make a decision about whether Mr. Hoskins wants to testify. If Mr. Hoskins doesn't testify in this case, what do you think about that?

Ms. Thomas: That's his choice.

Court: And do you understand the law is that he does not have to testify?

Ms. Thomas: That he does not have to, yes.

. . . .

Court: The way we normally phrase it is we ask you if you can completely disregard that fact and not use that in your determination of guilt or innocence. How do you think about that?

Ms. Thomas: If I am—I am not going to. Why would I? There would be no reason to. I was just telling you what I felt. I mean, that if he was innocent, then he should want to testify, because that's the way I feel. But I am not doing that in the court, am I? You are asking me my feelings, but what you are going to ask me to do in court is to weigh the evidence.

Court: Right. And can you put aside your feelings that you have just described and your thought process and not use that in your decision-making process at all?

Ms. Thomas: Yes.

¶ 46 Defendant challenged Juror # 74, Pizana, because he revealed that a friend was involved in the criminal justice system and that he (Pizana) was angry because his friend had falsely asserted innocence. The record indicates the following exchange:

Ms. Sanders: Okay. Would you understand that this is a completely different case?

Mr. Pizana: Sure, I understand that.

Ms. Sanders: Do you feel that you would be able to base your decision in our case solely on what we present to you in the courtroom?

Mr. Pizana: Sure. Because it is a different case.

. . . .

Court: Let me follow up on that. Do you think that that personal situation in that other situation would affect your ability to be fair and impartial here in this case?

Mr. Pizana: No, it shouldn't.

¶ 47 Finally, defendant challenged Juror # 76, Glow, because she was a practicing attorney. Despite defendant's concern, Ms. Glow stated that she could function as a fair and impartial juror in the present case:

Court: Do you think that you could put aside your knowledge of perhaps technically what is going on and just focus and decide this case based upon the evidence that's actually admitted?

Ms. Glow: Yes. I would definitely have to focus, but I could do it.

¶ 48 We observe that juror statements and circumstances normally warrant further exploration by the trial court to assure fairness and impartiality. Here, the trial court questioned each juror on matters of individual concern and was satisfied on the question of fairness. Prejudice will not be presumed but must appear affirmatively from the record. *See Trostle,* 191 Ariz. at 13, 951 P.2d at 878. The record discloses that, on questioning, the nine jurors each affirmed that he or she could be fair and impartial and would weigh the evidence as instructed by the trial court. The law requires no more. Each challenge was considered, and, in our view, the trial judge did not commit an abuse of discretion in denying challenges for cause as to the nine.

## VI. Death Qualification of Jurors

¶ 49 Defendant claims the state's requested instructions regarding the willingness of prospective jurors to convict, in light of the death penalty, simply created a pool of jurors more likely to convict and thus violated due process rights under the United States and Arizona Constitutions. Defendant contends this practice amounts to "death qualifying" the jury and that there is no valid justification to do so since the court, not the jurors, is solely responsible for sentencing in Arizona.

¶ 50 We have expressly rejected this argument. *See State v. Lee,* 189 Ariz. 608, 617, 944 P.2d 1222, 1231 (1997); *see also State v. Gulbrandson,* 184 Ariz. 46, 57, 906 P.2d 579, 590 (1995) (death-qualifying a jury does not violate the right to an impartial jury drawn from a fair cross-section of the community); *State v. West,* 176 Ariz. 432, 440, 862 P.2d 192, 200 (1993) (excusing jurors who disapprove of capital punishment does not violate Arizona constitutional ban against excusing jurors for their religious convictions), *overruled on other grounds, State v. Rodriguez,* 192 Ariz. 58, 64 n. 7, 961 P.2d 1006, 1012 n. 7 (1998); *State v. Schaaf,* 169 Ariz. 323, 331, 819 P.2d 909, 917 (1991) (jurors may be

death-qualified even though they do not impose the death penalty).

## VII. Juror Misconduct

¶ 51 Defendant also argues that the trial court erred in denying a mistrial based on his claim that a juror, Ms. Kirk, failed to disclose her acquaintance with a state's witness, Officer Rudy Zamora. After the trial, defense counsel learned that Kirk did not disclose that she recognized Officer Zamora. The record, however, does not establish that Kirk recognized Zamora. In fact, while Zamora told a prosecutor, Ms. Sanders, that he recognized Kirk as a Wal-Mart employee who had helped him on an occasion "[l]ong before the trial," Kirk denied recognizing Zamora and had no memory of him, having interacted with many customers as a Wal Mart employee. Further, Zamora testified that he did not know Kirk by name.

¶ 52 We review a trial court's denial of a motion for new trial on the abuse of discretion standard. *See Gulbrandson*, 184 Ariz. at 63, 906 P.2d at 596. Defendant's assertion of prejudice by the trial court's refusal to declare a mistrial on the basis of a juror's failure to disclose an event she did not recall, a single, wholly impersonal exchange between her, as a Wal-Mart employee, and Officer Zamora, as a customer, is unpersuasive. We cannot, under any interpretation of the record, characterize this association, and Kirk's failure to disclose it, as juror misconduct. The trial court did not abuse its discretion by refusing to grant a mistrial. Defendant has failed to demonstrate prejudice, and we do not presume prejudice from these facts. *See Trostle*, 191 Ariz. at 14, 951 P.2d at 879.

## VIII. Prejudicial Impact of Erroneous Evidentiary Rulings

¶ 53 Defendant contends the trial court erroneously denied various motions for mistrial following evidentiary rulings. We review a trial court's denial of a motion for new trial on an abuse of discretion standard. *See Gulbrandson*, 184 Ariz. at 63, 906 P.2d at 596. We address each of defendant's claims individually.

### A. Defendant's Prior Arrest

¶ 54 Defendant requests a new trial because a key state's witness, Mark Nelson, testified that he knew defendant from having been arrested together as juveniles making a "beer run."

¶ 55 This testimony was given in violation of a court order prohibiting its admission pursuant to Rule 404(b), Arizona Rules of Evidence. Defendant argues that the admission of the prior arrest statement was prejudicial because it invited the jury to conclude (1) that defendant was a proven criminal and therefore probably guilty of the crimes charged in the present case and (2) that defendant and Nelson were confidants and that defendant likely confided in Nelson his intent to commit a car-jacking and murder.

¶ 56 The state notes that witness Nelson's "prior arrest" statement was both unsolicited and in violation of an admonition by the prosecutor. Nelson made the statement when the prosecutor asked him when he had last seen the defendant. He responded, "the last time I saw him is when we both were arrested for a beer run thing...." Upon defense counsel's objection, the trial court recessed the proceedings to determine whether the misdemeanor theft charges arising from the prior arrest had perhaps been dismissed to permit the court to inform the jurors of the dismissal, thus curing any potential prejudice resulting from the statement. The court learned, however, that defendant had pleaded guilty to the charge, precluding the option of informing the jury that the matter had been dismissed. Upon consideration, the trial court denied the mistrial and asked whether defense counsel preferred a jury admonition or simply to proceed without comment. Defense counsel requested that the court proceed without comment.

¶ 57 The decision to grant or deny a motion for mistrial rests with the discretion of the court. We find reversible error only if refusal was a clear abuse of discretion. *See State v. Koch*, 138 Ariz. 99, 101, 673 P.2d 297, 299 (1983); *Gulbrandson*, 184 Ariz. at 63, 906 P.2d at 596. We will not reverse a conviction based on the erroneous

admission of evidence without a "reasonable probability" that the verdict would have been different had the evidence not been admitted. *See State v. Atwood*, 171 Ariz. 576, 639, 832 P.2d 593, 656 (1992).

¶ 58 The record contains strong circumstantial evidence of defendant's guilt. Defendant, by his own account, was in the vicinity of the victim's disappearance at the time she was last seen. He was seen with DeShaw climbing out of the overturned vehicle that the victim had been driving the previous night. DeShaw was in possession of the victim's key chain at the time of arrest. DeShaw's fingerprints were on various contents of the victim's wallet found miles from the scene of arrest but relatively close to the crime scene. Defendant was carrying the murder weapon on his person when arrested. He told Nelson earlier that he planned to car-jack a vehicle and kill the victim. Another witness, Masterson, heard defendant discuss, on various occasions, his desire to car-jack someone and to go to Pinetop. Though Nelson's "prior arrest" response violated the court order, there exists no reasonable probability that the verdict was affected by his prior arrest statement. *See Atwood*, 171 Ariz. at 639, 832 P.2d at 656. There was no abuse of discretion in the court's decision to deny a mistrial.

### B. Limitation on Defendant's Cross Examination of Nelson

¶ 59 Defendant argues the trial court abused its discretion by refusing cross-examination of witness Nelson concerning a conversation between Nelson and defendant's sister that would allegedly have revealed Nelson's anger toward defendant and establish bias.[4]

¶ 60 Specifically, defendant asserts that while incarcerated prior to trial, he informed his sister, Jenise, that an unknown figure, "Paul," gave him the gun used in the murder and that he had been framed for the crime. Defendant also asserts that Jenise repeated this story to Nelson. Defendant argues that he should have been allowed to

cross-examine Nelson concerning Jenise's alleged statement to Nelson about "Paul." Defendant argues that this hearsay should have been admitted under the "state of mind" exception to the hearsay doctrine because it would have shown that Nelson was aware of defendant's claims regarding "Paul" and, given Nelson's anger toward defendant, this was evidence that he might lie.

¶ 61 The state points out that any statement by Jenise to Nelson was hearsay and that Nelson's prior statements were consistent, did not demonstrate a motivation to lie, were not suggestive of Nelson's state of mind, and that defendant's statements to Jenise were simply his unsuccessful attempt to conjure up a third party defense.

¶ 62 The state argues that Nelson's testimony, based solely on a conversation with Jenise, would have no tendency to connect the unidentified "Paul" to the crime. *Cf. State v. Fulminante*, 161 Ariz. 237, 252, 778 P.2d 602, 617 (1988). Defendant introduced no evidence to suggest that even if Jenise had related the conversation to Nelson, it would have caused a deviation in Nelson's testimony.

¶ 63 We conclude that Jenise's alleged conversation with Nelson was unreliable hearsay unrelated to Nelson's state of mind. *See* Ariz. R. Evid. 803(3). Moreover, the trial court concluded that the defendant actually sought to introduce the hearsay conversation to prove the truth of the matter asserted, that is, to present to the jury, without testifying himself, the theory that some mysterious person named "Paul" committed the crime.

¶ 64 While evidence of third party culpability which raises reasonable doubt as to a defendant's guilt is ordinarily admissible, we do not allow it unless it would rationally demonstrate an inherent tendency to connect the other person with the actual commission of the crime. *See State v. Oliver*, 169 Ariz. 589, 591, 821 P.2d 250, 252 (App. 1991); *Fulminante*, 161 Ariz. at 252, 778

4. Nelson was allegedly angry with defendant because he had been arrested on a warrant stemming from the prior "beer run" incident, a warrant which he believed was sparked by the defendant.

P.2d at 617. Where, as here, the evidence is hearsay and raises nothing more than self-serving suspicion of third party involvement, the trial court was within its sound discretion to exclude it. *Fulminante,* 161 Ariz. at 252, 778 P.2d at 617.

### C. Improper Redirect of Detective Gissel

¶ 65 Detective Gissel testified concerning statements made to him by Nelson that the defendant intended to commit a car-jacking and to kill his victim. The defendant claims error, arguing that Gissel's testimony, as to things stated by Nelson, was hearsay, not prior consistent statements under Evidence Rule 801(d)(1)(B). The trial court, however, ruled these statements were consistent with the declarant's testimony and were admissible under Rule 801(d)(1)(B) because defendant had previously charged that Nelson was biased and had motivation to fabricate a predicate for admissibility under the Rule. The statements were also probative because they tended to establish defendant's plan, identification, and motive to commit a car-jacking.

¶ 66 This court has held that prior consistent statements, to be admissible, must be made before motivation to falsify arises. *See Maricopa County Juvenile Action No. JV-133607,* 186 Ariz. 198, 200, 920 P.2d 320, 322 (App.1996). On this point, Gissel's testimony, standing alone, was questionable because Nelson knew at the time he talked to police that defendant was implicated in a murder. But even if this testimony was improperly admitted, the error was harmless because all aspects of Nelson's prior statements were included in Nelson's own testimony, and Nelson was subjected to thorough cross-examination. *See State v. La Madrid,* 123 N.M. 463, 943 P.2d 110, 117 (N.M.Ct. App.1997) (prejudice to defendant is less likely to arise where statements bolstered with prior consistency were subject to cross-examination).

¶ 67 Defense counsel cross-examined Nelson about his anger toward defendant and any inconsistencies between his prior statements and his testimony. Importantly, Nelson and Gissel both testified consistently.

Gissel's testimony was thus cumulative and its admission was not an abuse of discretion. *See State v. Luzanilla,* 179 Ariz. 391, 398–400, 880 P.2d 611, 618–20 (1994).

### D. Limitation on Defendant's Cross Examination Regarding Nelson Polygraph

¶ 68 At trial, defendant sought to question the police decision not to administer a polygraph examination to Nelson, given Nelson's willingness to take the test. Defendant argues that this evidence indicates that the police did not consider Nelson to be a reliable witness. However, the state moved to exclude these questions, and the trial court granted its motion in limine.

¶ 69 On appeal, defendant claims the trial court erred, but this argument fails because Arizona courts, along with the vast majority of jurisdictions, consider polygraph examinations unreliable. We hold, therefore, that the trial court did not err as to this issue because all references to polygraph tests, absent stipulation, are inadmissible for any purpose in Arizona. *State v. Ikirt,* 160 Ariz. 113, 115, 770 P.2d 1159, 1161 (1987); *State v. Bowen,* 104 Ariz. 138, 141, 449 P.2d 603, 606 (1969). We decline the invitation to revisit this settled area of the law.

### E. Limitation on Defendant's Cross Examination of Witness Blades

¶ 70 Defendant claims prejudice stemming from the trial court's preclusion of cross-examination of state's witness Blades concerning statements about Nelson's reputation as a "braggart" and a "boaster." The state argues that such testimony was not relevant to Nelson's reputation for truthfulness and that the trial court did not abuse its discretion by precluding the cross-examination pursuant to Rules 404(a) and 608(a), Arizona Rules of Evidence.

¶ 71 Blades' proffered statements concerning Nelson were unrelated to the accuracy of Nelson's testimony or his veracity as a witness. The attributes mentioned by Blades do not relate to character but were at best vague, speculative, and immaterial. Exclusion was not an abuse of discretion.

## IX. Jury Instruction Errors

### A. Defendant's Requested Jury Instruction Number Five

¶ 72 The trial court refused to give defendant's requested jury instruction number five on separate and distinct offenses. Defendant assigns error, arguing that without the instruction, the jury was permitted to infer that if the defendant stole the vehicle, he also murdered the victim. The requested instruction provided:

> Each Count Charges a Separate and Distinct Offense. You must decide each count separately on the evidence and the law applicable to it, uninfluenced by any decision as to the other counts. A defendant may be convicted or acquitted on any of the offenses charged. Your finding as to each count must be stated in a separate verdict.

¶ 73 Where a defendant is charged and tried for two or more separate offenses in the same trial, the state must prove guilt on each charge, and the jury must decide each charge separately. *State v. Parra*, 10 Ariz.App. 427, 430, 459 P.2d 344, 347 (1969).

¶ 74 The state argues that the defendant's rights were not prejudiced because other instructions made it clear that jurors were required to decide each count separately. Included were statements that "the state must prove *each element of each charge* beyond a reasonable doubt" and "the state must prove *each charge* beyond a reasonable doubt." (Emphasis added).

¶ 75 In assessing the adequacy of jury instructions, the instructions must be viewed in their entirety in order to determine whether they accurately reflect the law. *State v. Walden*, 183 Ariz. 595, 613–14, 905 P.2d 974, 992–93 (1995), *rejected on other grounds by State v. Ives*, 187 Ariz. 102, 107–08, 927 P.2d 762, 767–68 (1996). Therefore, when the substance of a proposed instruction is adequately covered by other instructions, the trial court is not required to give it. *State v. Mott*, 187 Ariz. 536, 546, 931 P.2d 1046, 1056 (1997). In this case, the court could have given the requested instruction, but it would have been surplusage, and there was no error in omitting it because other instructions indicated that the state was required to prove "each charge" and "each element" beyond a reasonable doubt. There is nothing in the record to suggest that the jury misunderstood its mandate. Moreover, the use of separate verdict forms for each crime, coupled with the fact that the defendant was not convicted on the felony murder charge, but was convicted of premeditated murder, demonstrate the point.

### B. Defendant's Requested Jury Instruction Number Three

¶ 76 The trial court also declined defendant's requested jury instruction number three on witness credibility. Defendant argues his instruction was more comprehensive and precise than the Recommended Arizona Jury Instruction (RAJI) which the trial court used. Requested instruction number three read:

> In deciding the facts of this case, you should consider what testimony to accept, and what to reject. You may accept everything a witness says, or part of it, or none of it.
>
> In evaluating testimony, you should use the tests of accuracy and truthfulness that people use in determining matters of importance in everyday life, including such factors as the witness' ability to see, hear, or know the things the witness testified about; the quality of the witness' memory; the witness' manner while testifying; whether the witness has any motive, bias, or prejudice; whether the witness is contradicted by anything the witness said or wrote before trial, or by other evidence; and, the reasonableness of the witness' testimony when considered in the light of the other evidence.
>
> Consider all the evidence in light of reason, common sense and experience.

¶ 77 The trial court gave RAJI Instruction No. 18 concerning witness credibility, which provides:

> You must decide the believability of witnesses. In doing so, take into account such things as their ability and opportunity to observe, their memory and manner while testifying, any motive or prejudice

they might have, and any inconsistent statements. Consider each witness' testimony in light of all the other evidence in the case.

■■■ ¶ 78 The defendant is not entitled to a jury instruction in language precisely to his liking, as long as the requisite instructions are adequate. *See State v. Barker,* 94 Ariz. 383, 388, 385 P.2d 516, 519 (1963). In this case, while defendant may have preferred the expanded instruction, he does not argue that RAJI No. 18 was legally inadequate. In fact, the instruction given sets forth adequately the standard for assessing witness credibility.

## C. Verdict Form Instructions for First Degree Premeditated Murder and Felony Murder

■■ ¶ 79 Defendant argues he was prejudiced by the court's instruction concerning the difference between premeditated murder and felony murder because (1) it implicitly encouraged the jury to find guilt before considering whether the murder was premeditated and (2) it improperly suggested that a less than unanimous verdict on the murder count was appropriate.

¶ 80 The state contends the instruction informed the jury that while unanimity is not required as between felony murder and premeditated murder, a conviction of first degree murder does require jurors to find unanimously that the defendant committed the crime under one theory or the other, either as premeditated murder or as felony murder.

¶ 81 The matter was fully clarified by the verdict form itself. In particular, the jury was given a special interrogatory for the purpose of informing the court, at the conclusion of deliberations, which theory of first degree murder the jury had chosen. The signed interrogatory response expressly states that, of the twelve jurors, nine found the defendant guilty of first degree premed-

itated murder alone, and the remaining three found him guilty of both premeditated and felony murder. All twelve were thus unanimous on the premeditated theory. Any notion that the jury misunderstood the instruction was fully resolved by the special interrogatory. The defendant's argument is without merit.

## X. Constitutionality of the Arizona Death Penalty Statute

■ ¶ 82 Defendant, raising a series of challenges, argues that Arizona's death penalty statute is unconstitutional both facially and as applied on the record before us. A.R.S. § 13–703. First, he claims that section 13–703 creates a presumption that the death penalty is appropriate when aggravating circumstances are proved by the state and that this presumption violates the Eighth and Fourteenth Amendments. We have previously rejected this argument and adhere to our earlier decision. *See State v. Salazar,* 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992).

¶ 83 He also argues that section 13–703 is invalid as a preclusion of relevant mitigating circumstances at the sentencing hearing. We have rejected this claim and decline to revisit the issue. *See State v. White,* 168 Ariz. 500, 514–15, 815 P.2d 869, 883–84 (1991), *abrogated on other grounds by Salazar,* 173 Ariz. at 416–17, 844 P.2d at 583–84.

■■ ¶ 84 Defendant claims section 13–703 is unconstitutional because it eliminates jury consideration in the sentencing process, violating the Sixth, Eighth, and Fourteenth Amendments, and article 2, sections 23 and 24 of the Arizona Constitution. We have considered and rejected this argument and see no reason to depart from this settled area of law. *See Atwood,* 171 Ariz. at 646, 832 P.2d at 663. The issue was similarly resolved by the Supreme Court of the United States in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).[5]

---

5. We are aware of the Supreme Court's opinions filed recently in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Castillo v. United States,* 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000), and *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d

311 (1999), each of which addresses whether judges rather than jurors may make post-conviction factual determinations which operate to increase the defendant's sentence beyond the maximum prescribed by statute. None of these cases involved capital punishment, and the precise is-

¶ 85 Finally, defendant claims the United States Supreme Court in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), required that death penalty statutes provide a "greater degree of reliability" in assessing punishment, and that section 13–703 fails to comply with that requirement. We disagree. Contrary to the defendant's characterization, *Lockett* simply required that death penalty statutes not preclude the sentencer from considering mitigation evidence. Because section 13–703 includes the right to introduce evidence of mitigation in the sentencing proceeding, the statute complies with the *Lockett* mandate. *See State v. Lopez,* 175 Ariz. 407, 415, 857 P.2d 1261, 1269 (1993) ("[T]he only limitation on mitigating evidence is that it be relevant.").

### SENTENCING ISSUES

### XI. Aggravation/Mitigation

¶ 86 In assessing each death sentence, we undertake an independent review of the trial court's findings regarding aggravating and mitigating circumstances. A.R.S. § 13–703.01; *State v. Jones,* 185 Ariz. 471, 492, 917 P.2d 200, 221 (1996); *State v. Roscoe,* 184 Ariz. 484, 500, 910 P.2d 635, 651 (1996). The state bears the burden of proving the existence of each aggravating factor beyond a reasonable doubt. *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797 (1992). Mitigation, however, may be proved by the defendant or the state under the lesser, preponderance of the evidence, standard. *See id.* at 504, 826 P.2d at 801. While the trial court must consider all evidence of mitigation, the court is not required to accept all proffered evidence as mitigating. *State v. Ramirez,* 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994). On appeal, we determine whether the evidence of mitigation is sufficient to outweigh the evidence of aggravation established by the state. *See Brewer,* 170 Ariz. at 504, 826 P.2d at 801.

### A. Aggravating Factor—Pecuniary Gain

¶ 87 In the case at bar, the trial court found a single aggravating factor—pecuniary gain. A.R.S. § 13–703(F)(5). To establish the (F)(5) factor, the evidence must demonstrate that financial gain was a motive in the commission of the murder. *See State v. Soto-Fong,* 187 Ariz. 186, 208–09, 928 P.2d 610, 631–32 (1996) (financial gain as impetus for homicide); *Gonzales,* 181 Ariz. at 513, 892 P.2d at 849; *State v. Walton,* 159 Ariz. 571, 588, 769 P.2d 1017, 1034 (1989) ("[T]he purpose of the killing must be to further defendant's motive of pecuniary gain. . . ."). When a robbery victim is executed to facilitate the killer's escape and hinder detection for the purpose of successfully procuring something of value, the pecuniary gain motive is present. *State v. Lee,* 185 Ariz. 549, 558, 917 P.2d 692, 701 (1996); *State v. Ross,* 180 Ariz. 598, 605, 886 P.2d 1354, 1361 (1994); *Fierro,* 166 Ariz. at 551, 804 P.2d at 84; *State v. Rockwell,* 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989).

¶ 88 The expectation of pecuniary gain is also evident where a defendant commits a car-jacking, takes control of the vehicle, and subsequently murders the victim to gain continuous undetected possession and use of the vehicle. *See State v. Jackson,* 186 Ariz. 20, 30, 918 P.2d 1038, 1048 (1996) (defendant conceded motive was to steal car and valuables); *Lee,* 185 Ariz. at 558, 917 P.2d at 701; *State v. Miles,* 186 Ariz. 10, 17, 918 P.2d 1028, 1035 (1996); *Walton,* 159 Ariz. at 588, 769 P.2d at 1034 (defendant intended death of victim to afford more time to escape undetected with the car and money). Importantly, pecuniary gain may be predicated either on eyewitness evidence or on circumstantial evidence. *Soto-Fong,* 187 Ariz. at 208, 928 P.2d at 632 (pecuniary gain finding upheld if strongly supported by circumstantial evidence); *State v. Hyde,* 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996). In addition, even where pecuniary gain is the sole aggravating

---

sue is not raised and has not been briefed or argued in the instant case. Nor has the Supreme Court expressly overruled *Walton v. Arizona,* which, in 1990, upheld this state's capital sentencing scheme requiring trial judges to fix the severity of sentence in cases in which the jury

has returned a guilty verdict of premeditated or felony murder. Accordingly, until the Arizona death penalty statutes are fully analyzed under *Apprendi* and a final determination is made by the Supreme Court, this court remains bound by *Walton.*

factor supported by the evidence, the death penalty may be warranted. *State v. McKinney,* 185 Ariz. 567, 584, 917 P.2d 1214, 1231 (1996); *Spears,* 184 Ariz. at 295–96, 908 P.2d at 1080–81; *White,* 168 Ariz. at 511, 815 P.2d at 880, *abrogated on other grounds by Salazar,* 173 Ariz. at 416–17, 844 P.2d at 583–84.

¶ 89 The court below based its pecuniary gain finding on the actual taking of the vehicle, on its continued physical possession by the defendant, and on the defendant's prior statements of intent in conversations with his friends. Thus, before the murder, defendant on several occasions stated his plan and design to car-jack a vehicle and to kill the owner or driver to accomplish the desired result. Additional supporting facts were defendant's poor financial status, unemployment, lack of a vehicle, and desire to travel to Pinetop. Killing the victim under these circumstances provides solid footing for the pecuniary gain factor on the record before us.

¶ 90 The defendant, arguing against the pecuniary gain factor, reminds us that the jury did not convict of felony murder, but of premeditated murder. Nevertheless, we need not wonder how the trial judge concluded beyond a reasonable doubt that the proof fully sustained the pecuniary gain finding. Failure to prove felony murder does not impugn the pecuniary gain finding because, along with the conviction of first degree murder, the jury also convicted the defendant of armed robbery of the vehicle. The latter fully supports the pecuniary factor.

¶ 91 Moreover, just as a conviction of felony murder does not guarantee a finding of pecuniary gain, the absence of felony murder does not foreclose the pecuniary gain motive. This follows logically because pecuniary gain refers to the actual *motive* for the murder, A.R.S. § 13–703(F)(5), whereas felony murder avoids motive, invoking the question whether the murder occurred in the course and furtherance of a felony, or in immediate flight from a felony. Felony murder and

pecuniary gain may co-exist, but one may also exist without the other; they are neither synonymous nor co-extensive. The Cabral vehicle was commandeered and the theft accomplished by the defendant well before the murder was committed. Accordingly, the act of murder occurred after the act of theft was complete, or so the jury may have concluded.[6] Yet the defendant had committed armed robbery and was convicted of that crime. Pecuniary gain was at the very core of defendant's premeditated plan to obtain this vehicle.

¶ 92 The trial court thus correctly found that the state proved beyond a reasonable doubt that defendant murdered Crystel Cabral in expectation of pecuniary gain pursuant to the (F)(5) statute. Though pecuniary gain is the sole aggravating circumstance, it is wholly sufficient to make defendant death eligible, and, as noted, the death penalty is not inappropriate merely because pecuniary gain is the only aggravator of record.

## B. Statutory Mitigating Factors

### 1. Mental Impairment

¶ 93 The (G)(1) mitigating factor depends on evidence that "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–703(G)(1). An identifiable mental disease or psychological defect must exist to prove "significant impairment." *See State v. Laird,* 186 Ariz. 203, 208, 920 P.2d 769, 774 (1996); *State v. Apelt (Rudi),* 176 Ariz. 369, 377, 861 P.2d 654, 662 (1993); *Brewer,* 170 Ariz. at 505, 826 P.2d at 802. Character or personality disorders usually are not sufficient to find that a defendant was "significantly impaired." *See State v. Martinez,* 196 Ariz. 451, 999 P.2d 795 ¶ 52 (2000); *State v. Murray,* 184 Ariz. 9, 42, 906 P.2d 542, 575 (1995). And, as with other mental disorders, proof of

6. These facts suggest no overly expansive view of our felony-murder jurisprudence, as suggested by the dissent. *Infra* n. 10. It does demonstrate consistency, however, between the jury's conviction of armed robbery as the factual predicate for pecuniary gain, the conviction of first degree

premeditated murder and the court's subsequent sentencing determination, even in the absence of a felony murder finding. Nothing in the sentencing statute requires automatic rejection of the pecuniary gain factor in every case in which the jury fails to convict of felony murder.

actual causation between the impairment and the criminal act is essential. "[E]vidence of causation is required before mental impairment can be considered a significant mitigating factor." *State v. Stuard,* 176 Ariz. 589, 608 n. 12, 863 P.2d 881, 900 n. 12 (1993). The court does not equate impulsivity or poor judgment with mental inability to conform one's conduct to the law. *State v. King,* 180 Ariz. 268, 282, 883 P.2d 1024, 1038 (1994).

¶ 94 Here, the trial court found that defendant was not mentally impaired. The defendant's expert, clinical psychologist Richard Lanyon, failed to provide credible proof, and while Dr. Lanyon diagnosed defendant as suffering from Bipolar II Disorder, a mental illness characterized only in part by poor judgment and impulsivity, the trial court concluded that this opinion was "not supported by the test data compiled by Lanyon, [did] not even comport to the definition of the condition as listed in the Diagnostic and Statistical Manual of Mental Disorder IV [DSM IV], the Bible of psychiatrists and psychologists, and [was] totally refuted by the testimony of psychologist Michael B. Bayless."

¶ 95 Dr. Bayless, also an experienced clinical psychologist, rejected Lanyon's Bipolar II Disorder diagnosis, in part because the disorder requires a major episode of depression. Bayless found, upon interviewing the defendant and reviewing his record, that he had never suffered a major episode of depression. Bayless testified that "[t]here is absolutely no indication vis-a-vis the test data, records, information that is in the police reports or anywhere in this record that suggests that [defendant] is, in fact, a Bipolar II Disorder." Moreover, Bayless said that poor judgment and impulsivity are not unique to Bipolar II Disorder and that those characteristics are frequently observed in individuals diagnosed with the less severe antisocial or borderline personality disorder. In the end, Dr. Lanyon conceded, despite defendant's extensive record of incarceration in juvenile facilities, that he was not aware that any psychologist, psychiatrist, or other professional had ever diagnosed the defendant with Bipolar II Disorder, nor was any evidence offered indicating defendant had ever taken medication for Bipolar II or for any form of depression.

¶ 96 Defendant claims that Bayless' testimony supports the claim of mental impairment, underscoring the antisocial or borderline personality disorder that Bayless described. The flaw in this argument is that our established (G)(1) jurisprudence requires, unequivocally, that defendant be shown to suffer actual impairment due to mental illness. *See State v. Kayer,* 194 Ariz. 423, 437, 984 P.2d 31, 45, ¶ 50–51 (1999). The trial court concluded, accurately, that it was "clear from the testimony of the experts that this is simply a conduct disorder and is *not* a mental illness," (emphasis added) and that on this record, defendant's "anti-social or borderline personality disorder" did not support defendant's (G)(1) statutory claim of "significant impairment."

¶ 97 When independently reviewing a death sentence, we adhere to the rule that the credibility of expert witnesses is for the trier of fact. *See Martinez,* 196 Ariz. at 464, 999 P.2d at 808 ¶ 53 (deferring to the trial court's evaluation of medical experts' credibility); *State v. Doerr,* 193 Ariz. 56, 69, 969 P.2d 1168, 1181 ¶ 64 (1998) ("[T]he trial judge has broad discretion in determining the weight and credibility given to mental health evidence."). "The trial judge is in the best position to evaluate credibility and accuracy, as well as draw inferences, weigh, and balance." *State v. Bible,* 175 Ariz. 549, 609, 858 P.2d 1152, 1212 (1993); *see also State v. Milke,* 177 Ariz. 118, 128, 865 P.2d 779, 789 (1993) ("When mitigating evidence is conflicting and involves considerations of credibility, we give great deference to the trial court's conclusions."). On the record before us, we agree with the trial judge that Dr. Lanyon's testimony, introduced at the sentencing hearing relative to his diagnosis of the mental illness, Bipolar II Disorder, and his effort to find a link between the disorder and the crime, was thoroughly and effectively discredited by Dr. Bayless.

¶ 98 The finding that the evidence failed to establish Bipolar II is a key factor in our analysis. *State v. Lopez,* 175 Ariz. 407, 414, 857 P.2d 1261, 1268 (1993). This court has previously held that the trial court is not compelled to accept, as mitigating, psychiatric expert opinion testimony on significant

impairment, but may reject it in favor of other psychiatric evidence which contradicts it. *See State v. Wallace (II)*, 160 Ariz. 424, 426, 773 P.2d 983, 985 (1989). Upon review, we conclude the trial court correctly determined the (G)(1) impairment mitigator was not established.

### 2. Duress

¶ 99 Defendant argues on appeal that the crimes were committed under duress. Duress qualifies as a mitigating circumstance under A.R.S. § 13–703(G)(2) when it is unusual and substantial. *State v. Herrera*, 174 Ariz. 387, 400, 850 P.2d 100, 113 (1993). Here, the lower court emphasized that defendant neither claimed nor produced evidence in support of a(G)(2) duress finding. Our review of the record discloses no evidence suggesting the defendant acted under duress.

### 3. Minor Participant

¶ 100 Pursuant to section 13–703(G)(3), participation in a crime may be considered as mitigation where a defendant demonstrates that while he was legally accountable for the conduct of another, his participation in the crime was relatively minor. *Murray*, 184 Ariz. at 39, 906 P.2d at 572. Here, the state proved beyond a reasonable doubt that defendant was a major participant in the Cabral murder. Importantly, the jury reached the same conclusion during the guilt phase of the trial by finding defendant guilty of premeditated murder. There is no suggestion in the record that defendant's participation was "minor."

### 4. Unforeseeability of Death

¶ 101 The court may consider as mitigation a defendant's inability reasonably to foresee that his conduct will likely result in death. A.R.S. § 13–703(G)(4). Here, the trial court correctly determined that the defendant's planning, deliberation, the verbal statements of intent well in advance of the crime, and the actual murder weapon found on his person, pointed strongly to the foreseeability of the victim's death.

### 5. Age

¶ 102 The age of a defendant may be a mitigating circumstance. A.R.S. § 13–703(G)(5); *Jackson*, 186 Ariz. at 30, 918 P.2d at 1048. In assessing age as a mitigator, courts also consider intelligence, *Laird*, 186 Ariz. at 209, 920 P.2d at 775; level of maturity, *id.*; judgment, *Jackson*, 186 Ariz. at 31, 918 P.2d at 1049; past experience, *id.* at 30, 918 P.2d at 1048; criminal history, *Murray*, 184 Ariz. at 43, 906 P.2d at 576; and involvement in the crime, *Jackson*, 186 Ariz. at 30, 918 P.2d at 1048.

¶ 103 Here, the trial court determined that defendant, age twenty years, three months when the crime was committed, does qualify for statutory mitigation under (G)(5). A.R.S. § 13–703(G)(5). The court, however, afforded the factor insignificant weight because evidence of defendant's immaturity due to age or low intelligence was weak. His "numerous referrals and adjudications, including assaults and weapons crimes" led the court to conclude "that by past experience this defendant is very mature for his age."[7] The fact defendant was fully capable of conceiving and pre-determining a criminal plan and carrying it out in the face of every opportunity to choose a better course is a relevant consideration. Had the murder been committed on the spur of the moment, impulsively, or in a quick lapse of judgment, mitigation based on age would deserve more weight, but that was not the case.

¶ 104 Our review indicates that by all accounts, defendant tested as having average intelligence. His involvement in the criminal justice system is extensive, including violent offenses, and he carried out these crimes in the presence of his much younger sixteen-year-old brother-in-law.

¶ 105 Clearly, defendant made poor life choices, but we do not conclude that he "nev-

---

7. Dr. Bayless testified, based on defendant's juvenile records, that defendant previously had "somewhere in the neighborhood of fourteen referrals to the Juvenile Court" by the age of fourteen. Bayless testified further · that charges against defendant included burglary, assault, theft, arson, carrying a concealed weapon, criminal damage, domestic violence and threatening and intimidating.

er has had the experience of living as an independent functioning adult." *Trostle*, 191 Ariz. at 21, 951 P.2d at 886. Evidence from experts and family that he was susceptible "to peer pressure, needing to be liked as well as having impulse control problems," pales under the crimes he committed. While we recognize age and emotional immaturity as deserving some weight, neither warrants significant weight as mitigation on this record.

### 6. Disparate Treatment

¶ 106 The related question of disparate treatment is also raised by the defendant as between himself and his younger brother-in-law who received a lesser sentence. Notwithstanding the disparity, we are reminded that the evidence of actual culpability in the killing pointed to the defendant. He possessed the gun at the time of arrest; he was four years older; he took control of the encounter with the Walkers at the accident scene the morning after the murder; and most importantly, he masterminded the carjacking and theft of the vehicle, which set the stage for a murder that the defendant himself had pre-announced.

### C. Nonstatutory Mitigating Factors

### 1. Antisocial or Borderline Personality Disorder

¶ 107 We consider a mental disorder as nonstatutory mitigation, even though we may ultimately reject evidence as having no mitigating influence. *State v. Richmond (III)*, 180 Ariz. 573, 581, 886 P.2d 1329, 1337 (1994).

¶ 108 The trial court found that defendant had shown by a preponderance of the evidence that he suffered from antisocial or borderline personality disorder. But proof that such disorder exists does not of itself establish mitigation. *See Martinez*, 196 Ariz. at 465, 999 P.2d at 809 ¶ 61. For our purposes on review, it is essential not only that a personality disorder be shown to exist but that it be causally linked to the crime at the time the crime is committed. The trial court underscored Dr. Lanyon's Bipolar II Disorder diagnosis as contradictory and emphasized its finding that Dr. Bayless' diagno-

sis of "anti-social or borderline personality disorder" may have shown a disorder, but that the diagnosis had "failed to prove any causal nexus between the disorder and the killing."

¶ 109 We conclude on this record that the trial court correctly found the defendant failed to establish that his disorder caused an impairment, or that impairment was present at the time of the crime. Evidence of defendant's preplanning and execution of the carjacking and murder, including driving the victim to a remote desert area before taking her life, contradicts the expert testimony of Lanyon that defendant acted impulsively. In fact, evidence of impulsivity is non-existent in this record. Because defendant has not connected his anti-social or personality disorder to the car-jacking and murder, it cannot be considered a relevant mitigating circumstance.

### 2. Dysfunctional Family or Difficult Childhood

¶ 110 A dysfunctional family background or difficult childhood can be mitigating only if the defendant can establish that early experiences, however negative, affected later criminal behavior in ways that were beyond his control. *Martinez*, 196 Ariz. at 465, 999 P.2d at 809 ¶ 63; *Jones*, 185 Ariz. at 490, 917 P.2d at 219; *State v. Stokley*, 182 Ariz. 505, 524, 898 P.2d 454, 473 (1995). Thus, family dysfunction, as with mental impairment under the (G)(1) statute, can be mitigating only when actual causation is demonstrated between early abuses suffered and the defendant's subsequent acts. We reaffirm that doctrine here. *See State v. Mann*, 188 Ariz. 220, 231, 934 P.2d 784, 795 (1997) ("An abusive family background is usually given significant weight as a mitigating factor only when the abuse affected the defendant's behavior at the time of the crime."); *Jones*, 185 Ariz. at 490, 917 P.2d at 219; *Stokley*, 182 Ariz. at 524, 898 P.2d at 473; *Wallace (II)*, 160 Ariz. at 427, 773 P.2d at 986.

¶ 111 In considering mitigating evidence, the trial court determines whether the defendant proved mitigation by a preponderance of the evidence. *Lee*, 189 Ariz. at 607,

944 P.2d at 1221. The mitigating circumstances must be "relevant in determining whether to impose a sentence less than death...." A.R.S. § 13–703(G). If the defendant fails to prove causation, the circumstance will not be considered mitigating. However, if the defendant proves the causal link, the court then will determine what, if any, weight to accord the circumstance in mitigation. *State v. Towery*, 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996).

¶ 112 Here, the trial court did accord weight, albeit slight, to the defendant's upbringing and early experience. Nevertheless, while the trial judge correctly found the defendant's difficult childhood was proved, the evidence of causal nexus is weak to nonexistent. The only nexus urged by defendant-that by reason of his personality disorder, the murder was committed impulsively or in a moment of judgment lapse-was thoroughly contradicted by clear evidence of pre-planning and deliberation.

¶ 113 The "nexus" or "causal link" requirement in these cases has purpose. Where we determine questions of aggravation and mitigation in the sentencing process, the significant point in time for causation is the moment at which the criminal acts are committed. If the defendant's personality disorder or dysfunctional family background leads reasonable experts to conclude that the disorder in fact caused the crime, significant mitigation is established. But here, the evidence runs counter to that very proposition. The murder was not consistent with the proffered symptoms of personality disorder or family background because it was not an impulsive act, nor was it based on lapse of judgment.

¶ 114 The dissenting opinion expresses an impassioned description of the defendant's "horrific" childhood. We are aware of the circumstances of defendant's upbringing and have reviewed all aspects in minute detail. We have considered his past criminal record, his character and personality disorders, the relationship with his mother and siblings, the role of alcohol and drugs in his life, and we have read the testimony of Drs. Lanyon and Bayless. The dissent provides a graphic portrayal of all of it. Yet, it is clear that credible evidence in this record does not establish actual nexus with the crime, and our jurisprudence requires the nexus be proven. *Wallace (II)*, 160 Ariz. at 426–27, 773 P.2d at 985–86. Importantly, were we to hold otherwise, the family dysfunction factor and the impairment factor would become meaningless because virtually every homicide defendant can point to background dysfunction, abuse, or neglect as a basis for mitigation and leniency. *Murray*, 184 Ariz. at 44, 906 P.2d at 577 (quoting *State v. Bolton*, 182 Ariz. 290, 314, 896 P.2d 830, 854 (1995)).

¶ 115 Nor can we speculate on the factual predicate for causation in cases involving mental or emotional disorder. To do so unavoidably injects the court into mental health issues which judges are not equipped to resolve. That is why we rely on medical experts. As difficult as defendant's early circumstances were, the court must have credible direction from qualified experts as to the nature and extent of actual mental illness and its causal effect on the defendant at the time the criminal act is committed. We cannot forge a causal link unless the medical evidence provides foundation.[8] Here, the testimony of Dr. Bayless indicated the absence of foundation. Our requirement that experts furnish the factual predicate for mental illness or personality disorder, as well as their causal effects relative to the crime, is based in part on the fact that many persons suffer bleak, even horrible childhood experiences, as here, and yet go on to make valuable contributions in life without ever resorting to crime.

¶ 116 *State v. Spears* also involved the single pecuniary gain factor arising from theft of the victim's vehicle as the motive for the killing. In an attempt to avoid the death penalty, Spears made a similar claim of mitigation based on "dysfunctional family." 184 Ariz. 277, 293–94, 908 P.2d 1062, 1078–79

---

**8.** In sum, the record must contain *credible* expert testimony based on reasoned medical or psychological analysis that a causal link or nexus exists between the disorder and the commission of the crime. *See State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997) (psychiatric expert's testimony regarding diagnosis of mental disturbance and its nexus to the crime appeared credible).

(1996). Evidence established "that defendant suffered a physically and emotionally abusive childhood. His father drank considerably, was a strict disciplinarian, and beat defendant frequently." *Id.* at 294, 908 P.2d at 1079. The clinical expert "diagnosed defendant with post-traumatic stress disorder that could be retriggered at any time, causing impulsive, irrational behavior." *Id.* Speaking unanimously, this court said, "Even if this diagnosis [PTSD] is correct, it does not explain why defendant murdered [the victim]. Defendant's actions were planned and deliberate, not impulsive." *Id.*

¶ 117 In the instant case, credible expert testimony established similarly that defendant suffered from antisocial or borderline personality disorder which, as in *Spears,* could result in like symptoms-impulsive behavior and bad judgment. Yet, no medical or psychological expert could explain why or how antisocial or borderline personality disorder or the unwholesome childhood ultimately caused the defendant to commit an act of premeditated murder. His actions were anything but impulsive. Cabral was kidnapped and driven a substantial distance into the desert. All of this took time, allowing ample opportunity for defendant to reverse course and spare this victim's life. He was reasonably intelligent but nevertheless proceeded with execution of his plan.

 ¶ 118 We hold, therefore, that the factual circumstances of defendant's childhood, though extremely difficult, do not translate into relevant mitigation of his premeditated crimes. Of course, our view is contrary to that of our dissenting brethren. It is not, however, an abdication of responsibility to the medical specialists, but rather a recognition that judicial analysis, as a matter of law, is limited to the record presented. The record here does not offer requisite medical proof linking defendant's youth experience to the murder of Cabral. Any other conclusion would require us to create our own lay formula whereby bad experience suffered during youth can be measured by the court. We cannot in that manner forge our own causal link to the crime in the face of credible medical evidence to the contrary.

### 3. Good Behavior While Incarcerated

 ¶ 119 Good conduct during incarceration adduces a positive reaction but does not ordinarily warrant a reduction in sentence. *Atwood,* 171 Ariz. at 655, 832 P.2d at 672; *State v. Gillies (II),* 142 Ariz. 564, 571, 691 P.2d 655, 662 (1984).

 ¶ 120 Here, the trial court ruled that the defendant proved good behavior while incarcerated. The trial court found, however, given the deliberate nature of the defendant's crimes and the circumstances of Cabral's murder, that this nonstatutory factor does not merit weight or call for leniency. We agree.

### 4. Emotional Immaturity and Impulsivity

 ¶ 121 Defendant claims that emotional immaturity and impulsivity, independent of age, amount to mitigation, pursuant to A.R.S. § 13–703(G)(5). The trial court ruled that "[t]hese issues are covered by the court's discussion in [the] special verdict regarding age, impairment, dysfunctional family, and difficult childhood." The court rejected emotional immaturity and impulsivity as nonstatutory mitigating circumstances because, as noted, defendant's claim is refuted by the record. Defendant tested at an average level of intelligence, had extensive prior criminal involvement, and mental judgment was demonstrated by preplanning the present crime. The trial court stated: "[T]he fact that the defendant did not kill [Cabral] at the time of the car-jacking but instead waited for approximately 30 minutes to get her to a remote area in the desert for the killing shows deliberateness and an ability to delay gratification that refutes any claim of impulsiveness."

¶ 122 We agree with the trial court and reject the claim that defendant's emotional immaturity and impulsivity should be accepted as nonstatutory mitigation. As stated by the trial judge, "defendant was in control of his behavior, knew what he was doing, and coldly planned and executed his plan for murder." Defendant has failed to establish mitigation on this claim.

**154**

## XII. Independent Reweighing

■ ¶ 123 The process of weighing or reweighing aggravating and mitigating circumstances is not scientific, but, rather, inherently subjective. No mathematical formula exists which can be applied and none is required. *Bible*, 175 Ariz. at 608, 858 P.2d at 1211. The state has proven beyond a reasonable doubt the aggravating circumstance that this murder, a preplanned, deliberate killing, was committed with the motive and expectation of pecuniary gain. Defendant introduced evidence of age as a statutory mitigator, but we accord it insignificant weight, given defendant's range of adult experiences. We reject all other claims of statutory mitigation. Defendant failed to prove that he was mentally impaired, that he acted under duress, that he was a minor participant in the crime, that he could not foresee the victim's death as the logical result of his actions, or that he is a victim of unfair disparate treatment in light of his brother-in-law's lighter sentence.

■ ¶ 124 Similarly, the evidence of nonstatutory mitigation, including dysfunctional family, difficult childhood, antisocial or borderline personality disorder, and good behavior while incarcerated, is insufficient. Importantly, because we find that defendant failed to prove a mental disorder as the demonstrable cause of the Crystel Cabral murder, we conclude that all mitigation evidence, viewed separately or collectively, is insufficient to warrant a reduction in sentence.

## DISPOSITION

¶ 125 Upon full review, we affirm defendant's convictions and sentences.

CONCURRING: FREDERICK J. MARTONE, Justice, RUTH V. McGREGOR, Justice.

9. We are once again confronted with a case in which pecuniary gain is the sole aggravating factor. *See* Ariz.Rev.Stat. § 13–703(F)(5). I continue to have grave concerns regarding the application of this aggravator, especially where it stands alone, but will not repeat what I have said before. *See, e.g., State v. White*, 194 Ariz. 344, 356–57, 982 P.2d 819, 831–32 (1999) (Zlaket, C.J., dissenting), *cert. denied*, 529 U.S. 1005, 120 S.Ct. 1272, 146 L.Ed.2d 221 (2000); *State v.*

ZLAKET, Chief Justice, dissenting.

¶ 126 In *State v. Trostle*, 191 Ariz. 4, 23, 951 P.2d 869, 888 (1997), we stated:

In deciding whether death is an appropriate sentence ... we must look at more than just the facts of the crime. We must focus on the defendant in order to make an individualized sentencing determination as required by both the Arizona and United States Constitutions. In carrying out this responsibility, "we are sometimes called upon to reduce a death sentence to life imprisonment even in cases where the facts are aggravated and the tragedy immense."

(quoting *State v. Stuard*, 176 Ariz. 589, 605, 863 P.2d 881, 897 (1993)). I believe the majority fails to heed this admonition. In affirming Hoskins' capital sentence, today's opinion overlooks a clear contradiction between the jury verdict and the trial court's pecuniary gain finding.[9] It also ignores, or at least minimizes, substantial mitigating evidence. Taken as a whole, the facts and the law raise serious doubts here about the appropriateness of the death penalty. *See State v. Valencia*, 132 Ariz. 248, 250, 645 P.2d 239, 241 (1982)("Where there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence.").

### The Pecuniary Gain Finding

¶ 127 The only aggravating factor applied by the trial court, that the instant murder was committed "as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value," Ariz.Rev.Stat. § 13–703(F)(5), finds no support in the jury verdict. The jurors were instructed as follows with respect to felony murder:

The crime of first degree felony murder requires proof of the following two things:

*Greene*, 192 Ariz. 431, 445–46, 967 P.2d 106, 120–21 (1998) (Zlaket, C.J., dissenting), *cert. denied*, 526 U.S. 1120, 119 S.Ct. 1772, 143 L.Ed.2d 802 (1999). It is noteworthy, however, that the state has asked us to independently add an aggravating factor not found by the trial judge, perhaps reflecting its own discomfort with pecuniary gain as the sole death qualifier. We have properly denied this request.

Number one, the defendant, acting either alone or with one or more persons, committed the offense of kidnapping, armed robbery or robbery; and, number two, in the course of and in furtherance of such offense or immediate flight from such offense, the defendant or another person caused the death of Crystel Cabral.

A special written interrogatory requested "the particular theory used by each juror in rendering the verdict of guilty of First Degree Murder." It gave the jurors a choice of premeditated murder, felony murder, or both. Nine of them voted for premeditated murder only, and the remaining three voted for both theories. None voted for felony murder alone.

¶ 128 In *State v. Carriger*, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984), we stated that "[t]he court may find the aggravating circumstance of pecuniary gain when the basis of the first degree murder conviction is felony murder and the felony is robbery." In the present case, the jury convicted the defendant of armed robbery and kidnapping, thus satisfying the first prong of the given instruction. However, nine of the twelve jurors failed to convict on the felony murder theory, strongly suggesting an unwillingness or inability to find the second prong beyond a reasonable doubt, to wit, that the murder was committed "in the course of and in furtherance of," or during "immediate flight" from, those offenses. As a result, I believe the pecuniary gain aggravator is highly suspect.

¶ 129 In *Carriger*, we explained that "[t]o prove robbery, the state must show a *taking* of property from the victim; to prove pecuniary gain, the state must show the actor's *motivation* was the expectation of pecuniary gain. Proving a taking in a robbery does not necessarily prove the motivation for a murder...." *Id.* (emphasis in original) (citations omitted). Thus, "the state must prove additional facts to prove the aggravating circumstance of pecuniary gain once it has proved the robbery." *Id.;* see also *Gerlaugh v. Lewis*, 898 F.Supp. 1388, 1420 (D.Ariz.1995) ("[A] defendant found guilty of murder committed during the course of a robbery does not

necessarily qualify for the death penalty pursuant to the pecuniary gain factor."); *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991). In *Woratzeck v. Stewart*, 97 F.3d 329, 334 (9th Cir.1996), the Ninth Circuit elaborated on this distinction by noting that not "everyone convicted of robbery felony-murder is automatically death eligible. The State needs to prove at sentencing that the *killing* was done with the expectation of pecuniary gain." (Emphasis added). In other words, the state must prove more than the underlying crime to justify the aggravator.

¶ 130 Here, proof of motive for the killing was circumstantial at best. The fact that the jury did not convict the defendant of felony murder causes me to wonder how the trial judge could conclude *beyond a reasonable doubt* that the proof reached the level required for a finding of pecuniary gain. We have said that if the conclusions of the trial court at sentencing are not supported by the verdict, this court should not resort to "mental gymnastics to refute the findings of the jury." *State v. James*, 141 Ariz. 141, 146, 685 P.2d 1293, 1298 (1984) (holding that pecuniary gain was not established where the jury acquitted the defendant of aggravated robbery and theft).

¶ 131 I respectfully submit that if this homicide was committed as part of a robbery, which was the state's allegation all along, there should have been a felony murder finding. Because there was none, it is reasonable to suppose that the jurors were not convinced the killing occurred during the course of, or to facilitate, the robbery. Perhaps the defendant killed the victim for some other reason, or for no reason at all. The murder was certainly not necessary to complete the robbery. The perpetrators could have taken the car without committing a homicide. The jury also might have determined that the defendant completed the robbery or theft before forming an intent to kill; or it might simply have felt that the evidence was not strong enough to come to any firm conclusion in this regard-a reasonable position given that nothing in the record reveals details of the events immediately leading up

to and including the murder itself.[10]

¶ 132 One thing, however, seems clear: if pecuniary gain was conclusively established as the impetus for the murder, the jury should have found that the killing was committed "in the course of and in furtherance of" or during "immediate flight from" the robbery.[11] It did not. Thus, the verdict throws considerable doubt on the trial court's (F)(5) finding.[12]

### Mitigation Evidence

¶ 133 Even if we had a solid pecuniary gain aggravator, I would still believe that death is an inappropriate sentence here in light of the significant mitigating circumstances.

### Sentencing Disparity

¶ 134 I find it most troublesome that Scott DeShaw, whose involvement in this crime was at least equal to that of the defendant, received a natural life sentence. *See State v. Mann*, 188 Ariz. 220, 230, 934 P.2d 784, 794 (1997) (unexplained disparity in sentences of defendant and accomplice is mitigating); *State v. Marlow*, 163 Ariz. 65, 72, 786 P.2d 395, 402 (1989) ("[D]isparity between the sentences of accomplices . . . must be considered and may be found as a mitigating circumstance and weighed against any aggravating circumstances, in determining whether to impose the death penalty.").

¶ 135 Sentencing differences in cases like this are often explained by the fact that one accomplice played a greater role in the killing than the other. *White*, 194 Ariz. at 352,

982 P.2d at 827; *Mann*, 188 Ariz. at 230, 934 P.2d at 794. This is not such a situation. We do not know who committed the murder. The prosecutor admitted as much at the sentencing hearing: "We do not know for sure which defendant put the gun to [the victim's] head and pulled the trigger." She then relied on circumstantial evidence, such as the fact that the defendant had the gun in his pants when arrested and that he seemed to be in charge when the Walkers came upon him and DeShaw at the overturned vehicle, to assert that the defendant must have been the shooter. I respectfully submit that we should not base a life or death decision on such indefinite proof.

¶ 136 The majority acknowledges, but makes little effort to justify, this sentencing disparity. *Supra* at ¶ 106. It briefly mentions the "evidence of [Hoskins'] actual culpability," and then asserts that "most importantly, [the defendant] masterminded the car-jacking and theft of the vehicle." *Supra* at ¶ 106. I cannot reconcile this statement with the trial court's special verdict, which found beyond a reasonable doubt that "the defendant and his co-defendant Scott Deshaw both participated in the discussion and planning of a car-jacking murder, and equally participated in the execution of their plan."

¶ 137 In my view, the disparate sentences of the defendant and DeShaw have not been explained or justified. I seriously doubt that a reasoned explanation is possible.

---

10. The majority agrees that:

> The Cabral vehicle was commandeered and the theft accomplished by the defendant well before the murder was committed. Accordingly, the act of murder occurred after the act of theft was complete, or so the jury may have concluded.

*Supra* at ¶ 91. The opinion suggests, however, that because "[p]ecuniary gain was at the very core of defendant's premeditated plan," all of his actions on the date in question must have been infected with this original motive. *Supra* at ¶ 91. I submit that such an expansive view of our felony murder jurisprudence is unwarranted.

11. This assumes, as we must, that the jury followed the court's instructions. *State v. LeBlanc*, 186 Ariz. 437, 439, 924 P.2d 441, 443 (1996).

12. The pecuniary gain motive takes on special significance here for yet another reason. *See Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding that it is for the jury, not the judge, to decide defendant's intent for purposes of sentence enhancement); *see also, Castillo v. United States*, 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000); *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). "[W]hether judges rather than jurors may make post-conviction factual determinations which operate to increase the defendant's sentence," *supra* n. 5, is a question legitimately raised by the apparent conflict between the trial court's sentencing finding and the jury verdict. I disagree with the majority's decision to avoid it in this case.

*Age and Emotional Immaturity*

¶ 138 Both the trial court and the majority conclude that the defendant's age of twenty years, three months does not deserve significant weight as a statutory mitigator because of his average intelligence and alleged maturity. I respectfully disagree. In *Trostle*, we held that the defendant's age, also twenty years, was a mitigator when evidence showed that he was "a follower, easily manipulated," and had never lived as an "independent functioning adult"-this, despite the fact that Trostle was found to have average intelligence. 191 Ariz. at 21, 951 P.2d at 886.

¶ 139 Similarly, although Aaron Hoskins tested at an average level of intelligence, family members and experts alike agreed that he was a follower and easily manipulated. The evidence clearly indicates an extreme lack of maturity. Underlying themes in the defendant's juvenile records include his tendency to succumb to peer pressure, as well as his need to be cared for and shown the way. Mary Durand, a highly experienced investigator and mitigation specialist, testified that those records were "replete with comments about his inability to fight off peer pressure." A recurring concern in his parole plan evaluations was the need "to teach him to stand up for himself and to say no." A psychological evaluation conducted in 1987 described the defendant as being "vulnerable to peer pressure, needing to be liked as well as having impulse control problems." It also noted his inability to "express anger in a modulated fashion." The psychologist for the defense, Dr. Lanyon, testified that Hoskins is "pre-adolescent as far as his emotional maturity is concerned." Even the state's psychologist, Dr. Bayless, indicated that experts in the MMPI (a test used to measure personality and emotional functioning) would interpret the defendant's scores as being characteristic of, among other things, an "[i]mmature," "passive," and "dependent" person. The defendant's spouse, Tammy, expressed frustration over being more like a mother than a wife to him. In an interview with Durand, Tammy said that Hoskins "was easily led [and] that other people always controlled him like she had. That he really needed somebody to tell him what

to do, when to do it, where to do it, and how to do it." This evidence plainly contradicts the majority's conclusion that the defendant's immaturity and impulsivity are "refuted by the record." *Supra* at ¶ 121.

¶ 140 The court's opinion further says, "we do not conclude that [the defendant] 'never has had the experience of living as an independent functioning adult.'" *Supra* at ¶ 105 (quoting *Trostle*, 191 Ariz. at 21, 951 P.2d at 886). I reach a contrary conclusion. The defendant moved from his mother's house to various motel rooms with his wife, and subsequently to his in-laws' home. He did not have a job and did not support himself or his wife. Indeed, Dr. Bayless testified that the defendant showed consistent signs of irresponsibility by never maintaining employment or honoring financial obligations.

¶ 141 Moreover, contrary to the majority, I submit that the defendant's criminal history does not demonstrate that he was "very mature for his age." *Supra* at ¶ 103 (echoing the trial court's assertion). A close look at the crimes he committed reveals that most were related to his youth. They begin at eight years of age and do not in any way indicate maturity or sophistication. In fact, they suggest just the opposite. One assault charge stemmed from an incident in which the defendant threw a snowball at another youngster and broke the window of a passing car. The second assault was an after-school fight involving another boy who earlier had struck Hoskins in the face with a whiffle ball. A third assault occurred when the defendant tried to choke another youngster with a plastic necklace after the latter hit him. The weapons offense arose when, at age eleven, he took a gun to school to compare its size with guns brought to school by other boys that same day. A burglary conviction resulted from the defendant having accompanied his older sister when she took $400 from their intoxicated grandmother, who was babysitting them at the time. Finally, an arson conviction came about when he and some friends set fire to a shed.

¶ 142 The contexts in which these crimes occurred confirm the defendant as an immature follower and a child with no parental guidance or supervision. Consequently, I

conclude that his age of twenty years and three months qualifies as a statutory (G)(5) mitigator and should be given significant weight, as should the nonstatutory mitigating factor of emotional immaturity.

### Mental Impairment and Abusive Childhood

¶ 143 The trial court found that the defendant had "not shown by a preponderance of the evidence that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired" within the meaning of Ariz.Rev.Stat. § 13–703(G)(1). It also concluded that, for purposes of nonstatutory mitigation, the defendant demonstrated an antisocial or borderline personality disorder but failed to prove a causal nexus between that malady and the killing. The majority agrees that the defendant has "not connected his anti-social or personality disorder to the car-jacking and murder" and gives no weight to this factor. *Supra* at ¶ 109.

¶ 144 Again I must disagree. In the first place, I reject any suggestion that proof of a causal connection always falls short of the mark in the absence of some magic words uttered by a psychologist or psychiatrist. We are talking about life or death, and insisting upon a formulaic approach to such a complex decision trivializes the inquiry. To my mind, the evidence here links the defendant's mental impairment and abusive family background to his criminal behavior. Because of their close relationship, I address these mitigating factors together.

¶ 145 Both the trial court and the majority place great emphasis on the testimony of Dr. Bayless, the state's psychologist. At the same time, they all but dismiss the defense expert, Dr. Lanyon, despite the fact that he has been in practice for over thirty years and is on the faculty at Arizona State University. Dr. Lanyon personally conducted psychological tests on the defendant. Dr. Bayless did not. I have considerable difficulty understanding, in a case where the ultimate decision must be life or death, how Dr. Lanyon's testimony can be so completely disregarded.

¶ 146 Although Dr. Bayless disagreed with Dr. Lanyon's opinion that the defendant suffered from Bipolar Disorder II, he did diagnose a borderline and/or antisocial personality disorder. According to both expert witnesses, the criteria for this syndrome include a pervasive pattern of disregard for the rights of others as shown by at least three of the following traits: (1) failure to conform to social norms, indicated by repeatedly performing unlawful acts; (2) deceitfulness; (3) impulsivity or failure to plan ahead; (4) irritability and aggressiveness; (5) reckless disregard for the safety of self or others; (6) consistent irresponsibility as indicated by the failure to sustain consistent work; and (7) lack of remorse. Although not agreeing in their ultimate diagnoses, both doctors found that the defendant demonstrated those characteristics set forth in numbers two through six. Dr. Bayless testified that, according to the defendant's MMPI scores, "[h]e doesn't have the controls necessary," resulting in "even more poor judgment" and "even more impulsive" traits. According to him, "people who have this have a tendency to act out in outbursts of violence. . . ."

¶ 147 Both experts concurred that the defendant's family history and life experiences could have been factors in creating his antisocial personality. Having reviewed the circumstances of defendant's upbringing, Dr. Lanyon testified that "it is certainly sufficient to have created those characteristics. I mean, the difficulties are certainly sufficient. The detachment, the lack of parental control, the abuse of alcohol, the sexual abuse, the neglect, the permissiveness in committing crimes. The modeling for crimes went on." He further stated, "[f]or a person who had an antisocial personality disorder regardless, the impulsiveness, the disregard of the law and the belief that one is entitled to do what one desires to do, and this is sort of a long-range, a long-range set of beliefs, *would certainly be characteristics that would be shown in this particular crime.*" (Emphasis added). Dr. Bayless did not challenge or contradict this opinion. In other words, the testimony of the two psychologists together support a causal nexus between the defendant's traumatic childhood, his resulting mental status, and his criminal behavior.

¶ 148 Other evidence points strongly to the same conclusion.[13] Mary Durand testified that she spent approximately forty hours with the defendant, far more than either psychologist, over the course of twenty or more visits. She also spent six hours with the defendant's sister Melissa, nine hours with his wife Tammy, and one day with his mother. Durand testified to the defendant's manic behavior, which she witnessed during her visits with him. She observed episodes of depression and described suicide attempts that were noted in reports and by the defendant's family.

¶ 149 The defendant's juvenile records repeatedly refer to impulsive behavior and vulnerability to peer pressure. They also show that he was a risk to himself and others, had problems with responsibility and decision making, and exhibited a history of aggressive and oppositional behavior.

¶ 150 The history of Hoskins' dysfunctional family and childhood abuse is well documented. The Arizona Juvenile Needs Assessment Form from the Department of Corrections Youth Parole Plan indicates that his parents were "unwilling or uninterested in caring" for the defendant and that the lack of resources in the home were such that his "parents [were] unable to provide appropriate care." Durand interviewed the defendant's mother and opined that she had "never seen a woman express less interest in a child in [her] life." As examples, Ms. Durand noted that the defendant's mother did not remember that her son had repeated a grade in school or that he had broken his leg when he was five years old. In addition, the correc-

tions plan confirms that there was considerable fighting and conflict in the home.

¶ 151 Defendant's juvenile records show that the he had a history of alcohol and drug abuse from an early age and that his sister, Melissa, led him to these addictions. Testimony indicated that he started drinking alcohol as early as age six and used marijuana at age eight. Melissa confirmed this, saying that she provided the defendant with alcohol and drugs when he was very young, and introduced him to crime around age ten. In fact, according to Melissa, the defendant's mother and grandmother excessively abused alcohol, and both drugs and alcohol were readily available in the home. According to Hoskins' wife, the drug culture continued to envelop him during their marriage—the two of them consumed enormous amounts of crystal methamphetamine.

¶ 152 A predisposition report indicates that the defendant was physically abused by both his mother and sister. It is also clear that the mother never intervened in any way on her children's behalf, particularly the defendant's. In fact, Mary Durand described her own interaction with the defendant's mother as "one of the most disheartening and uncomfortable interviews because the woman knew absolutely nothing about her child.... She really couldn't be bothered." In a report from the Arizona Department of Youth Training and Rehabilitation, an officer recommended that "because of the home situation, the lack of parental supervision by [the defendant's mother], Aaron's use of alcohol, drugs, and the continued violence in the

---

13. I have no quarrel with mental health practitioners, but find the majority's abdication of responsibility to them quite alarming. *Supra* at ¶ 115. In effect, the fate of capital defendants is placed almost exclusively in the hands of expert witnesses who are paid to appear and testify, and who more often than not disagree in important ways. Their "bible," as the trial judge called the DSM IV, is essentially a litany of possible findings and diagnoses. It represents an admirable attempt to bring order to a field of study that continues to be murky because of the frequent absence of truly objective symptoms and the remarkable individuality of the human mind.

To my knowledge, no previous decision has proclaimed such fierce allegiance to the need for psychiatric or psychological testimony, or such complete reliance upon it. I cannot accept that

common sense, human experience, simple observation, and eyewitness accounts are to be left at the door in future searches for the elusive "nexus." In my opinion, judges must do more than simply choose a "winner" in the battle of hired experts.

Moreover, no consideration seems to have been given by the majority to the clear advantage the state has in procuring such witnesses. Superior resources for prosecutors and the constant battle for funds faced by indigent defendants and their counsel, especially in our rural counties, will perpetuate or perhaps even exacerbate the disparity that already exists between rich and poor. The court's language regarding experts is most unfortunate and, in my judgment, unnecessary.

home involving Aaron, the only answer is that Aaron be sent to the Arizona State Department of Corrections." Thus, prison was deemed a better environment for the defendant than his own home!

¶ 153 Records from the Department of Corrections indicate that as part of the defendant's probation he was to have no contact with Melissa. This condition was violated when Melissa continued to live in the home after the defendant was released on probation. He was thereafter returned to custody. Although his mother knew of the probationary condition, she allowed the defendant to be sent back to prison instead of preventing her adult daughter from continuing a relationship with him.

¶ 154 All of the children in the defendant's home had criminal records. The perversity of the family situation, however, is perhaps best illustrated by Melissa's conviction on a charge of armed robbery. She admitted committing the crime to be with her girlfriend, who had previously been incarcerated. She then committed additional offenses in prison so that she could be sent to maximum security, where the girlfriend was confined.

¶ 155 According to his juvenile records, Melissa's testimony, and the mother's interview with Durand, Hoskins never lived with his father. His mother left that relationship before the defendant was born, when Melissa complained that the man was sexually abusing her. That marriage was the mother's fourth or fifth, and her four children had three different fathers. She remarked that there had been "a pretty extensive amount of inbreeding" in the family of Hoskins' father.

¶ 156 In her interview with Durand, the defendant's wife, Tammy, said that she met him when they were both sixteen years old. On the day they met, the two of them went to her motel room where she provided him with drugs and alcohol. The next day he moved in with her. According to Melissa, Tammy sold drugs, was involved in prostitution and pornography, and physically abused the defendant. The two later lived in the home of Tammy's mother, where they used alcohol and drugs with her the mother, her boyfriend, and Tammy's younger brother, codefendant DeShaw. Defendant's mother-in-

law ultimately died of alcohol-related problems.

¶ 157 Although evidence of the defendant's sexual abuse is based on his self-reporting, it is significant that he told both his sister and wife about it long before he committed the present crimes. According to Melissa, Hoskins slept in the same bed with his mother, behind a closed door, until he was approximately ten years old, even though he had his own room. She thought it was definitely possible that the defendant's mother had sexually abused him. In addition, Durand testified that Dr. Bayless told her the defendant's mother "would have to maintain that emotional profile [of detachment from her son] to be able to have a sexual relationship with him." When Hoskins finally moved out of his mother's room, he moved in with his older sister, Jenise. Melissa testified that when the defendant was fourteen years old, he told her that Jenise was molesting him.

¶ 158 Defendant's wife was the first person to tell Mary Durand about sexual abuse issues in the family. Tammy said Hoskins confided to her that he had fathered Jenise's oldest child when he was thirteen years old. The defendant also told Tammy that he once walked in on Jenise and her twin brother, James, having sexual intercourse. Tammy told Durand that Hoskins was "extremely disturbed by this" and that "he was very private about it [and] didn't want people to know because they would think he was crazy." Tammy thought that the defendant's sexual behavior with her had been damaged by his relationships with his mother and sister. In addition, when James later drowned in a lake, the defendant was unable to forgive himself for anger he felt toward his brother because of the latter's involvement with Jenise. Although the death was considered accidental by the police, the defendant and his family believed it was a drug-related murder.

¶ 159 Finally, the defendant told Melissa in letters from prison that he had been forced to have sex with people when he was a child, after she confided to him about having been raped. Virtually all of the evidence and the testimony of the witnesses is consistent with the defendant's claims of sexual abuse and

with what we now know about this young man's upbringing. Moreover, the fact that the defendant told his sister and wife about the abuse before he committed the offenses herein increases the reliability of the information, and, indeed, the trial court found the evidence credible.

¶ 160 In summary, the above proof is more than sufficient to support a finding that the defendant suffered from an abusive and traumatic childhood. I disagree with the majority's assertion that no credible evidence exists linking the defendant's early life to this crime. It defies reason and common experience to suggest that a youngster coming out of the horrific environment described in the evidence was largely unaffected and should be held accountable as a functioning adult. At the age of twenty, he had not lived away from this terribly dysfunctional situation for any significant period of time. There is no evidence that he had ever overcome his past and acted as a mature adult.

¶ 161 The majority cites several cases in which we did not find abusive family backgrounds to be mitigating because the defendants failed to establish any link between their crimes and the past. All are distinguishable from the present case. In *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989) (*Wallace II* ), and *State v. Stokley*, 182 Ariz. 505, 524, 898 P.2d 454, 473 (1995), the defendants were adult offenders, ages thirty-three and thirty-eight, respectively. Both failed to show how their family backgrounds influenced their murderous behavior. In *Wallace II*, the defendant raised the issue of a difficult family background for the first time on appeal and never claimed that it had anything to do with his crime. 160 Ariz. at 426–27, 773 P.2d at 985–86. Similarly, the defendant in *State v. Towery*, 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996), was twenty-seven years old, and we observed that his childhood abuse had occurred long before he robbed and murdered.

¶ 162 *State v. Spears*, 184 Ariz. 277, 282–83, 908 P.2d 1062, 1067–68 (1996), relied on by the majority, is also inapposite. There, the defendant was thirty-three years old at the time of the crime. He feigned a romantic relationship to gain the victim's confi-

dence and then proceeded to breach her trust in shocking fashion. Thinking she was going on a trip with her "boyfriend," the woman was persuaded to use her credit card to obtain cash, merchandise, and an airline ticket for him. The defendant also duped her into signing over the title to her car before he killed her. These facts place *Spears* alongside *State v. Willoughby*, 181 Ariz. 530, 533–34, 892 P.2d 1319, 1322–23 (1995) (carefully planned killing of one spouse by the other) and *State v.. Milke*, 177 Ariz. 118, 120–21, 865 P.2d 779, 781–82 (1993) (plan by mother to have her infant child slain for insurance proceeds) at the extreme end of the (F)(5) spectrum. At the same time, *Spears* provides little or no detail with respect to that defendant's mental health and abusive family background. Only one paragraph of the opinion is devoted to the subject. Thus, we have no idea how persuasive that evidence might have been, especially when weighed against a very strong aggravator.

¶ 163 Although the trial court in *State v. Murray* found that the two defendants, Robert and Roger Murray, suffered from a dysfunctional background, there was no proof that this impacted their criminal behavior. 184 Ariz. 9, 40, 44, 906 P.2d 542, 573, 577 (1995). In Robert's case, the forensic psychologist testified that there was no evidence of mental disorder or defect at the time of the crime other than intoxication. *Id.* at 39, 906 P.2d at 572. In *State v. Jones*, 185 Ariz. 471, 490–91, 917 P.2d 200, 219–20 (1996), the defendant's stepfather and a court-appointed expert testified that the defendant's abusive and chaotic childhood "colored his behavior," but we were unable to find any connection between this history and his conduct on the night of the murders. Finally, in *State v. Bolton*, 182 Ariz. 290, 313–14, 896 P.2d 830, 853–54 (1995), the testimony of the defendant's psychologist, who diagnosed him as being emotionally handicapped and suffering from a conduct disorder, was contested by the state's expert who was unable to find any acute emotional disorder or signs of a mental defect. Neither psychologist testified that the defendant's capacity to conform his conduct to the law was impaired. The argument

that his abusive childhood affected his ability to cope and to control impulses came only from defense counsel. *Id.* at 314, 896 P.2d at 854.

¶ 164 In stark contrast, Hoskins was only twenty years old and had not yet escaped his dysfunctional family situation. In fact, he apparently committed this crime while on his way to visit and make amends with his mother. He clearly was not free of her influence. Dr. Lanyon testified that the defendant's early use of drugs and alcohol prevented him from developing emotional maturity, which is the "process of learning to cope intellectually, where you cope by using your thoughts." This process normally begins in early childhood and continues through adolescence. He also stated that drug and alcohol use during this period served "as an escape so you don't have to face [emotions] or learn to deal with them." He concluded that Hoskins "cannot help but be pre-adolescent as far as his emotional maturity is concerned.... I believe he is engaged in none or at least very little of those extensive learning experiences that one needs to have so that one can handle one's feelings by working them through in one's head."

¶ 165 Defendant's abuse of alcohol at the age of just six years is very different from the substance abuse we have seen in other cases. A child that young cannot be expected to make informed decisions concerning the consumption of such substances. We expect parents and other caretakers to guide children in making healthy choices. Here, however, drugs and alcohol were freely available in the defendant's home for his entire life, and he was encouraged to participate by the very people who should have been protecting him from these dangerous activities. As Mary Durand testified,

I don't know that [Hoskins] had an opportunity nor had the maturity at age four or five, six, seven and eight to make decisions to walk away from a family that had already significantly destroyed his ability to think, to reason, to reflect, and to act in appropriate ways because none of them have ever acted appropriately.

To think that such abuse did not directly affect the defendant's ability to act as a responsible and productive adult is to entertain fantasy. I believe the evidence clearly demonstrates a reasonable connection between Hoskins' upbringing and· the murder of Crystel Cabral. Defendant has shown, through the testimony of expert witnesses and others, an abnormal mental status resulting from his abusive background, characterized by impulsiveness, a disregard of the law, and a pattern of acting as he desired without considering consequences. Dr. Lanyon's testimony sensibly links these traits to the present crime.[14]

¶ 166 In *Trostle* we recognized that the legislature did not intend to include "character and personality disorders" as mitigation under Ariz.Rev.Stat. § 13–703(G)(1). 191 Ariz. at 20, 951 P.2d at 885. We also noted, however, that "even if a disorder does not rise to the level of mental disease or defect originally contemplated in (G)(1), the inquiry is not over." *Id.* There continues to be a duty to examine the facts for their nonstatutory mitigating value, a distinction the majority seems to ignore. Thus, "[i]n considering evidence of mental impairment, our primary task is to determine its mitigating weight, if any." *Id.* at 20–21, 951 P.2d at 885–86. The weight given should be proportionate to "a defendant's ability to conform or appreciate the wrongfulness of his conduct." *Id.* at 21, 951 P.2d at 886.

14. The majority explains that "[w]here we determine questions of aggravation and mitigation in the sentencing process, the significant point in time for causation is the moment at which the criminal acts are committed." *Supra* at ¶ 113. I agree. In affirming this death sentence, however, the opinion concludes that when the murder occurred, the defendant—assuming he was the shooter—did not act on impulse, did not suffer from any lack of judgment or abnormal mental state, and was motivated entirely by pecuniary gain. But there is no evidence in the record about the moment of killing, and/or the events immediately leading up to it. That is precisely why the trial judge refused to find the (F)(6) aggravator (offense committed in a "heinous, cruel or depraved" manner) requested by the state. It is also why I believe(F)(5) was not proven beyond a reasonable doubt, *supra* at ¶¶ 127–32, and why the majority's repudiation of the mitigation evidence is so speculative.

¶ 167 Here, the defendant's evidence was sufficient to establish by a preponderance-the full extent of his burden—that mental abnormalities impaired his ability to conform his conduct to the requirements of the law. In addition, by showing that his mental status was linked to his dysfunctional family background, Hoskins has demonstrated that these unfortunate life experiences directly affected his ability to control his actions. I believe the majority errs in not giving this evidence serious consideration as nonstatutory mitigation.

### Independent Reweighing

¶ 168 When there is only one aggravating factor and significant mitigation, a serious question is raised as to whether a death sentence is warranted. *State v. Marlow*, 163 Ariz. 65, 72, 786 P.2d 395, 402 (1989); *State v. Rockwell*, 161 Ariz. 5, 16, 775 P.2d 1069, 1080 (1989). When there is doubt about the imposition of the death penalty, the court should resolve the doubt in favor of a life sentence. *Marlow*, 163 Ariz. at 72, 786 P.2d at 402; *Rockwell*, 161 Ariz. at 16, 775 P.2d at 1080. In this case, the defendant's age, emotional immaturity, extremely dysfunctional family background, and mental impairment are significant mitigators, while the only aggravator, pecuniary gain, is at least in question.

¶ 169 The death penalty should not be imposed in every capital murder but should be reserved for cases where either the manner of the commission of the offense or the background of the defendant places the crime "above the norm of first-degree murders." *State v. Blazak*, 131 Ariz. 598, 604, 643 P.2d 694, 700 (1982); *see also State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988); *State v. Correll*, 148 Ariz. 468, 485, 715 P.2d 721, 738 (1986). There is nothing remarkable about this crime when compared to other first degree murders. I do not in any way excuse the defendant's conduct but merely conclude that he is no more nor less culpable than his companion/co-defendant. This fact, coupled with the significant mitigation discussed above, mandates that he should not be executed, but instead should spend the rest of his natural life in prison.

CONCURRING: STANLEY G. FELDMAN, Justice.